# EXHIBIT D

File reference:  I C 28/12



# JUDGMENT
## IN THE NAME OF THE REPUBLIC OF POLAND

On December 29, 2015.

District Court in Lublin, 1st Civil Department

composed of:

**Chairman - Judge:**          Judge Maria Stelska

**Recorder**:                            Court Secretary Edyta Stanisławek-Krukowska

after being examined at the hearing on 29 December 2015 in Lublin

**the case brought by** Solo Investment limited liability company

located in Rozplucie Pierwsze

**against** Ludwin Commune.

for payment

I.    the Court adjudges the defendant Ludwin Commune to make a payment to the Solo Investment limited liability company based in Rozplucie Pierwsze in the amount of PLN 11,239,951.09 (eleven million two hundred thirty-nine thousand nine hundred fifty-one and 09/100) with statutory interest from December 3, 2011 to the day of payment;

II.   in the remaining part, the claim is dismissed;

III.  the Court adjudges the defendant Ludwin Commune to make a partial refund of court costs to the Solo Investment limited liability company based in Rozplucie Pierwsze in the amount of PLN 21,652.12 (twenty-one thousand six hundred fifty-two and 12/100);

File reference:  I C 28/12

## JUSTIFICATION

The plaintiff, Solo Investment, a limited liability company with its registered office in Rozplucie Pierwsze on January 13, 2012 filed a lawsuit against defendant, Ludwin Commune for the award in the amount of PLN 13,899,266.46 with statutory interest from November 17, 2011 to the date of payment as reimbursement of the expenses incurred by the plaintiff and his legal predecessor on the property owned by the defendant Commune in a connection to the invalid „Lease Agreement of the JAGODA Recreation Resort by Lake Piaseczno" dated February 15, 2007, affected by the significant error, deceitfully caused by a representative of the Commune of Ludwin and regarding the content of a legal transaction.

The plaintiff also requested that the defendant pay his process costs, including costs of legal representation.

Justifying its demand, the plaintiff announced that on 15 February 2007 between the Ludwin Commune and ANTAR Ltd. limited liability company represented by the President of the Management Board Andrzej Pawlak, lease agreement was concluded for the JAGODA Holiday Resort on Lake Piaseczno, covering plots with a total area of 9.19 ha marked in the land register of the village of Rozplucie, with numbers 90 and 94/2.

The defendant in the contract assured that he is the owner of the above-mentioned property pursuant to the decision of the Lublin Province Governor in 1991, in accordance with the local spatial development plan of Lake Piaseczno treated as a tourist service area, and the property is free from encumbrances, and the Commune does not know about any circumstances excluding the use of real estate for running a vacation resort. The purpose of the contract was to adapt the property to the needs of a modern,

1

high-standard leisure center, where vacationers will be able to have comprehensive physical and mental recreation services available. The plaintiff was obliged to incur expenditures on the property, and the defendant agreed to deduct the documented expenses from the rent. The determination of the amount of expenditures was to take place on the basis of an investment cost estimate. The contract also provides for the right to purchase the subject of the lease through a non-tender procedure on terms specified in separate regulations.

According to the agreement, the lessee (both the original - ANTAR and his legal successor - that is, the plaintiff's company) built up the property, and the value of outlays amounted to PLN 13,899,266.46.

By a letter dated 12 August 2011, the President of the Management Board of Solo Investment LLC addressed to the Ludwin Commune summoned to enter into a contract for the sale of the leased real estate in the mode of non-tender sale, setting the date of commencement of this contract. At the same time, he applied for the submission of full documentation regarding the current legal status of the property.

The municipality indicated that the claim in the mode of non-tender sale is only due to the decision to sell the plot, while the Ludwin Commune is not currently selling real estate.

The plaintiff also demanded an update in the land and mortgage register No. LUI1/00141599/3 legal status regarding plot no. 94/2, sized 0.0454 ha, which in the book is indicated as the property of WPT ,,Lublinianka'' in Lublin. In the letter dated September 22, 2011, the defendant informed the plaintiff about the re-vindication proceedings pending since 1991 regarding the part of the real estate No. 90.

In view of this information, the President of Solo Investment LLC proposed to terminate the contract by agreement of the parties and reimbursement of expenses by the claimant made on the property, but which were not credited to the rent.

2

The defendant indicated in the letter of October 13, 2011 that he did not consent to terminate the lease agreement by mutual agreement and did not agree to the return of expenses.

By letter of November 17, 2011, the President of the Management Board of Solo Investment LLC submitted to the Mayor of the Ludwin Commune a written declaration on the evasion of the effects of declaration of intent to conclude a lease agreement of real estate submitted under the influence of error, resulting from false assurances of the defendant that the property is free from encumbrances and property rights and liabilities of third parties, and that the President of Solo does not know about any circumstances that preclude the use of real property for running a holiday resort along with false assurance of the right to purchase the subject of the lease in a non-tender mode.

This standpoint was supported in further procedural documents, in particular in a letter dated 5 December 2012 *(k. 239 and n.),* in which it indicated that the obligation to return expenditures is based on the construction of the return of undue payment.

In response to a lawsuit *(k. 94 and n.),* the defendant did not recognize the claim, requesting its dismissal in its entirety. She also demanded that the trial costs be borne in her own name, including the costs of legal representation in accordance with the prescribed norms.

She indicated that the plaintiff did not keep the one-year deadline for submitting a declaration of will to evade the effects of a statement made under the influence of an error. She stated that the plaintiff was aware of the administrative proceedings regarding the return of the property [to a third party] prior to the transfer of this information to the Head of the village by letter of 22 September 2011, no later than on the date of 2 April 2008.

Moreover, she stated that all contractual clauses, both on the date of signing the contract and on the day of preparing the reply to the statement of claim, were in line with the actual and legal state, therefore the allegations of fraudulent misrepresentation are

3

unfounded. For these reasons, in the opinion of the defendant, the lease contract remains in force, and therefore the claim for unjust enrichment is unfounded. In the case of procedural prudence, the defendant Commune questioned the amount of expenses incurred by the plaintiff.

In connection with the expert opinion in the field of construction raised in the case, the respondent claimed that taking into account the amount of expenditure should take into account the reimbursement by the party of deductions from tax due for input tax, and further that due to the part of the work performed by the plaintiff's employees, no VAT should be included *(letters k. 720-729, 744 -775, 776-780, 881-890, 907-910, 958-965, 986-990, 1009-1013)*

In response, the plaintiff indicated that there were no net settlements in the Polish legal system, and if the court acknowledged the claim, the reimbursement would be reimbursed, and the reimbursement amount cannot be reduced by the VAT tax charged previously, because such an operation is not permitted in the form of reducing inflows to the Treasury in the form of non-payment of VAT. Moreover, he added that it is irrelevant that some of the work was done by the plaintiff's and his predecessor's employees, because their work was also an outlay, and the employer had to pay them the remuneration and could not assign to other works. *(letters, k. 764-767, 793-801, 834-837, 970-973, 1056-1060)*

**The District Court determined the following facts:**

On February 15, 2007, between Antar LTD, a limited liability company based in Lublin, represented by Andrzej Pawlak - the president of the board of directors, and the Ludwin Commune represented by Mayor of the Ludwin Commune - Zygmunt Ogórka, a lease agreement was concluded, under which the Ludwin Commune leased Antar Ltd real estate made up of plots of land designated in the land register of the village of Rozpłucie Pierwsze No. 90 and 94/2 with a total area of 9.19 ha to develop with a guesthouse for 50 beds, a fast service bar and a commercial building, including a camping site excluding a

4

strip of land with a width 2mb, counting from the fence mesh from the north side, intended for a pedestrian route. The contract was concluded for the period from March 1, 2007 to December 31, 2032.

The lessee undertook to use the subject of the lease on running a business. According to his statement, the goal conclusion of the contract was the adaptation of the property for the needs of a modern high standard holiday resort, where vacationers will be able to have comprehensive physical and mental recreation services available, in accordance with the program and spatial concept of the summer recreation center at Lake Piaseczno, constituting Annex 3 to the contract (§1 of the contract).

In § 2 of the lease agreement, the Commune stated that the property is free from encumbrances and property rights and liabilities of third parties and that it does not know about any circumstances that preclude the use of real property for running a holiday resort.

The agreement allowed for the assignment of tenant rights and obligations resulting from the contract for the benefit of the entity related to the lessee (§5 point 3 of the contract).

The lessee undertook to pay a rent of PLN 50,000 gross for a 12-month settlement period, which was to be modified annually until March 31 of each year, based on the inflation rate adopted in the budget act for a given year (§7).

In § 9 of the contract, the lessee undertook to incur expenditures on property, and the lessor agreed that the cost of tenants' own outlays on the property would be deducted from the rent. If the amount of outlays exceeded the amount of rent in a given year, the difference was to be taken into account in the following years.

The parties defined expenditures as capital expenditures in the course of adapting real estate for use as a modern Recreation Center, in the course of the real estate use and operation of the facility as well as costs of replacement, reconstruction and demolition of used infrastructure, demolition and construction of new buildings, constructions and other construction objects.

In the contract the lessor granted permission to adapt the property for use as a modern holiday center through the exchange, reconstruction and demolition of the used infrastructure, demolition and construction.

The amount of expenditures to be credited to the rent was to occur each time before they were incurred on the basis of the investor's cost estimate.

In § 12 of the contract, the parties agreed that the lessee has the right to purchase the subject of the lease by way of no-tender procedures on the terms specified in separate regulations (in the case of development based on a building permit).

(*agreement for the lease of the JAGODA Holiday Resort on Lake Piaseczno from February 15, 2007, k. 17-20*)

On February 28, 2007, based on the handover and acceptance protocol, the lessor handed over the property specified in the contract to the lessee *(handover and acceptance report, k. 22)*

Pursuant to an agreement concluded on 23 September 2009, Antar LTD a limited liability company based in Lublin transferred to Solo Investment a limited liability company with headquarters in Warsaw the rights and obligations of Antar LTD, resulting from the lease agreement of the Holiday Resort Jagoda on Lake Piaseczno of February 15, 2007, between the Ludwin Commune and Antar LTD sp. z o.o. The Mayor of the Ludwin Commune gave permission for the above-mentioned assignments provided that the

6

headquarters of the Solo Investment company was transferred to the territory of Ludwin Commune. The company is currently headquartered in Rozplucie Pierwsze, in the Ludwin Commune.

*(contract of transfer of rights and obligations under the lease agreement, k. 24-28, letter GN 7224 / 9-11 / 07/09, copy 29, excerpt from the Register of Entrepreneurs of the National Court Register of December 22, 2011, k. 14-15)*

After the transfer of the real estate, the company commenced investments. At the end of the individual stages of work at the center, the lessee presented post-construction cost estimates to the Defendant, which were verified by a person having appropriate qualifications. The defendant approved expenditures incurred in the period from March 1, 2007 to March 1, 2011 for the total amount of PLN 13,899,266.46. These amounts were used to deduct the rent for the years 2007-2011 for a total amount of PLN 287,353.63 *(letters, k. 37-43, testimonies of Miroslaw Wozniak, Krystyna Florek, Wieslaw Tokarz, k.252-254, CD, k. 255, in the scope of rent, circumstances are undisputed).*

The total value of the robot made for the property on which the holiday center at Piaseczno Lake is run was PLN 11,481,329.10 (PLN 9.138.171,62 net)

*(opinion and supplementary opinions of the expert in the field of construction with attachments, k. 381-636, 711-714, 756v-758, 922-951, 994-997, oral supplementary opinion, k.1036v-1037)*

By a letter of August 12, 2011, the plaintiff called the defendant Commune to conclusion of a contract in the mode of non-tender sale of real estate including plots No. 90 and 94/2, for which the District Court Lublin - East with its registered office in Swidnik keeps land and mortgage registers for (LU1I / 00135980/6 and LU1I / 00141599/3 respectively), citing § 12 of the contract for the price of PLN 14,950,000.00 less the value of expenditures borne by the tenants since 2007, i.e. PLN 13,889,266.46. Thus, the price was set at PLN 1,060,743.54, plus the rental fee previously deducted from expenditures in the total amount of PLN 287,354.63, and thus finally for the price

7

of PLN 1,368,098.17. The claimant indicated the date of conclusion of the contract on September 5, 2011.

She also asked for full and documented information on the current legal status of the real estate.

In reply, the Mayor of the defendant Commune reported that according to the regulations Real Estate Management Act of August 21, 1997 real estate owned by the Commune may be sold through a non-tender procedure only in cases specified in the Act, when the owner makes a decision on the sale, which the Commune of Ludwin does not plan to do.

The representative of the defendant Gmina did not appear in the indicated office notary in order to conclude the contract.

The plaintiff reiterated the call for information on the legal status of the property and requested the Ludwin Commune to update the legal status of plot no. 94/2 due to the fact that the owner of WPT "Lublinianka" in Lublin and not the Ludwin Commune were entered in the land and mortgage register.

The Mayor of the Ludwin Commune, in a letter dated 22 September 2011, stated that the Commune is the owner of the whole real estate, while the declarations included in the contract and regarding the legal status of the property were consistent with the actual and legal status. Moreover, he stated that since 1991 administrative proceedings have been pending for the return of the real estate constituting part of plot No. 90, initiated from the application of the former owner.

In a letter dated 12 October 2011, Solo Investment LLC urged Ludwin Commune to terminate the lease agreement on the basis of agreement between the parties within 14 days of receipt of the request and to return the value of the landlord's expenditure on the property not previously included in the rent, less the total amount of defendant's rent, and thus the amount of 13,592,363.00 PLN.

8

It justified the above actions by the defendant, in particular the refusal to sell the leased property, which led to issues based on legal grounds, economic desirability and the validity of the continuation of the lease agreement.

Ludwin Commune did not agree to terminate the contract by agreement of the parties.

In a letter presented to the defendant Commune on November 18, 2011 plaintiff, as the legal successor of Antar LTD limited company responsibility in Lublin and a tenant of real estate located in the village of Rozpłucie Pierwsze, covering plots No. 90 and 94/2, made a declaration on the evasion of the legal effects of the declaration of will on the conclusion of the lease contract of the "JAGODA" Holiday Resort on Lake Piaseczno of 15 February 2007, submitted under the influence of a significant error, deviously triggered by the Ludwin Commune and concerning the content of legal action, consisting of:

1.  false assurance in the wording of § 2 of the aforementioned agreement that "lessor confirms that the real estate indicated in § 1 is free from encumbrances and property rights and liabilities of third parties and does not know about any circumstances that preclude the use of property for running a holiday resort "

2.  false assurance in the wording of § 12 of the above-mentioned contract "the lessee is entitled to purchase the subject of the lease by way of non-proprietary terms on the terms specified in separate regulations (in cases of development based on a building permit)",

while the Commune does not provide for the sale of real estate, where a re-vindication proceeding is pending, which excludes the possibility of actual and legal purchase of this property.

Solo Investment, a limited liability company, called for the reimbursement of the value of expenditures in the amount of PLN 13,899,266.46 within 14 days of receipt of the tender offer.

*(letter dated August 12, 2011, k. 45-49, letter dated 29 August 2011, GN.6845.l.2011, k. 51, protocol of appearance of one party and failure to appear by the other party, k. 53-54, letter of 15 September 2011, ref. 56, letter dated 22 September 2011, GN.6845.1.2011, n. 58, letter of 11 October 2011, k. 60-62, letter dated October 13, 2011, GN6845.l.2011, k. 64)*

Then, on February 27, 2012, the Defendant was summoned to appear for the purpose of transferring the property. Ludwin Commune in reply, dated 1 March 2012, stated that it upholds its position expressed in a letter dated 1 December 2011. In view of the failure of representatives of the Commune on the day indicated, the plaintiff prepared a report of appearance of the first party and failure to appear of the second party for the purpose of transferring the property, signed by three witnesses. Without the presence of the defendant, in the presence of the witnesses indicated, she made the property transfer protocol. She submitted the protocols to the Ludwin commune. From § 2 lit. g of the real property transfer protocol shows that the company considers the transfer act to be made. However, the Commune defended the actions, indicating that the lease contract of February 15, 2007 still applies.

*(letter dated 24 February 2012, point 231, letter dated 1 March 2012, k. 232, information about the minutes, k. 233, protocol for the appearance of one and the default of the other party to transfer the property, k. 234, property transfer report dated March 5, 2012, k. 235-236, letter dated March 16, 2012, at 237)*

Since 1991, in relation to the part of the plot No. 90, formerly marked in land and building registry as plot no. 285, administrative and court-administrative proceedings concerning the return of property to

previous owners expropriated in the seventies, currently in the person of their heir - Jerzy Wojtasiewicz, were pending.

*(uncontested circumstances, testimony of Jerzy Wojtasiewicz, shortened report of the hearing, no. 309-311, CD, k. 312)*

In the letters of 2 April 2008, the Leczna County informed about initiating, upon the request of Antar LTD sp. z o.o., administrative proceedings regarding development, utilities and development of plots no. 90 and 94/2 in Rozplucie Pierwsze, on the premises of „JAGODA" Holiday Resort. These letters were also sent to the attention of Jerzy Wojtasiewicz, which was shown in their contents *(k. 172, 180, 187, 200, 207)*

In the course of the above-mentioned proceedings, Jerzy Wojtasiewicz applied for their suspension until the decision of the Minister of Infrastructure issued in case BO 1d / 782-R-124/07 concerning the return of the expropriated real estate - former plot No. 285, now part of plot No. 90. Applications were not delivered to the lessee.

Decisions of 30 April 2008 (cases: BAO.IV.7351/120/08-4, BAO.IV.7351/119/08-4, BAO.IV.7351/118/08/-04, BAO.IV.7351/117/08-4, BAO.IV.7351/104/08-4, BAO.IV.7351/105/08-4, BAO.IV.7351/98/08-6, BAO.IV.7351/98/08-5), the Leczna County refused to suspend the proceedings, indicating at the same time that Jerzy Wojtasiewicz is not a party to them, the provisions were also served on Antar Ltd on May 2 and 5, 2008. and picked up by Wieslaw Tokarz.

*(applications for suspension of proceedings, k. 171, 178, 186, 193, 199, 206, 212, orders of 30 April 2008, notes 168-169, 175-176 183 184, 191-192, 196-197, 203-204, 209-210, 213-214, acknowledgment of receipt, k. 170v, 177v, 185v, 198v, 205v, 211, 215)*

Jerzy Wojtasiewicz, by a letter filed on April 1, 2008, reported to District Prosecutor's Office in Lublin motion for commencing criminal proceedings

in connection with the investment carried out by Antar LTD sp. z o.o in Lublin without the required building permit on plot No. 90 located in the town of Rozplucie - Garbow. In the course of the proceedings, it was stated that sanitary facilities set without the required permit were dismantled. By virtue of a decision of 28 April 2008, the Poviat Police Headquarters in Leczna refused to initiate an investigation against the negligible social harmfulness of the act. *(application to initiate criminal proceedings, k. 653, documents, k. 654-682, 693-696, order of 28 April 2008, k. 685)*

Jerzy Wojtasiewicz also visited the premises of the holiday resort in 2007-2008, when construction works were in progress, informing employees that the right to part of the property is contentious. However, he did not talk to the president or owner of Antar LTD.

The employees of the holiday resort informed Wieslaw Tokarz about the fact that someone claims the rights to the real property and that the proceedings are in progress. Wieslaw Tokarz did not provide this type of information to the company's authorities, considering that it is not within his competence.

*(testimony of Jerzy Wojtasiewicz, shortened trial report, k. 309-311, CD, 312, testimony of Wiesław Tokarz, k. 252-254, CD, k. 255)*

On June 13, 2008, in the course of proceedings for determination invalidity of the decision of the President of the Office of Housing and Urban Development of 22 March 2000 (P0.5.1-0-85-99), maintaining in force the decisions of the Lublin Province Governor dated 14 December 1998 (GKN.GW.7221-2 / 76 / 98) refusing to return the property located in the city of Rozplucie-Garbów, marked as plot No. 285 with an area of 3.21 ha, which is part of the current plot No. 90, the real estate in which he participated, marked in the protocol, as the lessee - Wiesław Tokarz, and the attorney-at-law, Marek Pawłowski, was marked as proxy. Jerzy Wojtasiewicz also participated in the activities *(inspection protocol, k. 98-101).*

12

Antar LTD was called upon to make the plot available for inspection by the Ministry of Infrastructure. At the behest of the Mayor of the Ludwin Commune, Zygmunt Ogórka - Krystyna Florek, the inspector for real estate management in the Office of the defendant Commune, contacted Wieslaw Tokarz with a request to make the property available for an inspection.

Wiesław Tokarz had authorizations granted on 10 April 2008 and 12 June 2008 by the President of Antar LTD to represent him before public administration authorities, in all matters related to the proceedings regarding the investment in the Antar Resort Piaseczno on the Lake Piaseczno.

Marek Pawłowski had authorization from June 12, 2008 to represent Antar LTD a limited liability company based in Lublin to represent it before public administration authorities, common and administrative courts and other entities in matters related to proceedings regarding investment in Antar Resort Piaseczno on Lake Piaseczno. The authorization was granted by the management of the Company.

The authorization held by Wiesław Tokarz and Marek Pawłowski was granted according to the needs - that is, in the event of the need to submit or collect documents in the course of proceedings before administrative authorities, mainly building authorities.

Wiesław Tokarz is not an employee of the plaintiff, he has rendered services for him (and his legal predecessor) during the investment process, in particular in the scope of obtaining building permits.

The above powers of attorney did not authorize to represent Antar LTD Ltd. in the course of proceedings for the return of real estate. The company was not a party to this proceeding. During the inspection, Wiesław Tokarz submitted his

13

authorization to the employees of the Ministry of Infrastructure and it was not questioned.

After completing the inspection, Wiesław Tokarz reported to the deputy Mayor of the Ludwin Commune for information about the results of the inspection, which informed him that they were beneficial for the Commune. Wiesław Tokarz forwarded this information to Andrzej Pawlak, the president of the board of Antar LTD. The chairman of the board of the company decided that there was no problem associated with this proceeding.

*(authorization, k. 221-223, 895.896, testimonies of Andrzej Pawlak, Krystyna Florek, Wiesław Tokarz, Sławomir Czubacki, everyone, k.252-254, CD, k. 255, Elżbieta Skarbek, k. 78lv-783, Daria Predko , k. 783-784, Jarosław Tarnasiewicz-Heldut, k.1037v-1039, summons, k. 891, confirmation of receipt, k. 893)*

The real estate, on which the "JAGODA" Holiday Resort was located on Lake Piaseczno, was for many years the subject of lease contracts, but immediately before the conclusion of the lease contract with the lessee, the holiday resort was run by the Ludwin Commune, due to the lack of willing external entities. In the tender announcements placed by the Ludwin Commune, information about the lack of real estate encumbrances was included.

During several months of negotiations regarding the conclusion of the contract, representatives of the Ludwin Commune did not inform representatives of Antar LTD about pending expropriation proceedings. Both the Mayor of the Commune and his deputy, in connection with the position of Antar LTD, predicted the possibility of selling real estate in the future, after making an investment for the infrastructure of a holiday resort.

Representatives of the Commune were afraid that in the event of immediate action selling the whole property, the company will divide it and sell it to other entities, while the municipality wanted to preserve

14

the current character of the property. Each party was represented by entities providing legal aid.

*(testimony of Andrzej Pawlak, Krystyna Florek, Wiesław Tokarz, Slawomir Czubacki, Zygmunt Ogórek, k.252-254, CD, k. 255, Jaroslaw Tarnasiewicz - Helduta, k. 1037v-1039)*

The District Court determined the facts based on the evidence provided.

In principle, the documents presented by the parties were not questioned, except the inspection report of the property of 13 June 2008 *(k. 98-101),* to the extent that Wieslaw Tokarz as the lessee was determined, and Marek Pawlowski as the representative of the lessee. Nevertheless, despite the objections of the plaintiff's proxy regarding the lack of influence of marked persons on the manner of their specification in the report, it should be pointed out that Wieslaw Tokarz explicitly stated that he considers himself to be a tenant for his mistake, which clearly shows that he knew how in the protocol he was specified, and all claims about adding his person post factum are not confirmed in the actual state.

In view of all the above-mentioned documents, the Court gave faith.

When assessing the testimonies of the witnesses, the Court first considered which party from the trial the given witness was involved with at the stage of preparation and implementation of the contract, as well as now, because the content of the testimony was largely related to this circumstance.

It should be pointed out, however, that the witness Andrzej Pawlak, acting as the president of Antar LTD (like Jaroslaw Tamasiewicz-Heldut) had detailed information on the negotiation process and conclusion of the lease agreement, whereas in the scope of the investment itself, in particular administrative proceedings, his knowledge in a large it was based on information obtained from Wieslaw Tokarz, who as part of

15

his business activity dealt directly with the issues of building permits and related administrative processes, activities on the property itself, as well as contacts with the Ludwin Commune (of a less formal nature).

Witness Zygmunt Ogorek, on the other hand, repeatedly during testimonies was oblivious to oblivion, which was associated with a stroke he had suffered. On behalf of the Commune, due to the scope of duties and direct participation, and therefore knowledge in this subject, detailed testimony was made by Krystyna Florek, while the negotiation process between the Municipality and Antar LTD was also known to Slawomir Czubacki, deputy Mayor during negotiations, currently no longer a deputy Mayor.

The witness Mirosław Woźniak is not directly involved in the dispute, his testimonies were factual and did not raise any doubts. Similarly to the testimonies of the real estate owners participating in the survey in June 2008, employees of the Ministry of Infrastructure: Elzbieta Skarbek and Daria Predko.

There was also no basis for refusing credibility of Jerzy Wojtasiewicz's testimonies, which were also confirmed in the documents in the files of the case, and which presented facts, obviously from the perspective of the witness situation.

In view of the above circumstances, the Court gave faith in testimony of: Andrzej Pawlak, Wieslaw Tokarz, Jaroslaw Tamasiewcz-Heldut, Slawomir Czubacki, to the extent they reported that in the course of the negotiations, the Commune presented the opportunity to sell real estate to the representatives of the company, and the concerns expressed by the Commune authorities regarding the parceling and sale of plots, irrespective of arrangements of the local spatial development plan, are in logical relation with the content of the contract and investments then taken by the plaintiff and his predecessor. It should also be pointed out that in the case of entities conducting real estate development activity on a large scale, based on the principles

of life experience, it is difficult to accept that these entities undertook significant investments, without the guarantees provided by the Ludwin Commune. For these reasons, Krystyna Florek and Zygmunt Ogorek, who testify to the invariable declarations of the Commune that the contract concerns the lease, did not envisage the sale, could not be considered credible. Moreover, one should emphasize the contradiction in the testimonies of Zygmunt Ogorek, who once pointed out that it was impossible to sell the plot due to the recovery proceedings, and then that the inability to sell resulted only from the conditions of its communalization (and thus the resort through the Commune). The second argument is in obvious contradiction with the possibility of selling it as provided for in the contract.

However, the issue of the lack of official information about the ongoing recovery proceedings in relation to part of the real estate were in fact undisputed between the parties. Zygmunt Ogorek testified that he did not inform the lessee at any stage of the negotiations about the pending return of the property, he also had no knowledge if any of the employees gave such information, in any case it should be considered that he did not issue such orders. However, Slawomir Czubacki testifies that the municipality downplayed the proceedings, pointing to the obvious unfounded claims of J. Wojtasiewicz, which is in essence expressed in the testimonies of Zygmunt Ogorek.

Witness testimony of Wieslaw Tokarz, in the scope in which he presented his knowledge of return proceedings, is unclear, because he states that he was not informed about the pending proceedings, then that he tried to find out in the Commune Office, and that he inspected the property inspection with applications for EU funds, and further, that he knew that the inspection was related to the claims of "some people" regarding real estate. On the other hand, Krystyna Florek's testimony, in so far as she states that she unequivocally informed Wieslaw Tokarz about the pending refund procedure and that it excludes the possibility of selling

17

the real estate, taking into account the whole of the evidence, one cannot find confirmation.

Credible, because it corresponds with the content of files submitted to the file documents are testimonies of the witness Zbigniew Dabka (k 1149-1150). Witness described the process of issuing construction permits, refusing to suspend the investment process, but also the course of the meeting at the District Head of Leczna County office. He admitted that the meeting was attended by Jaroslaw Tamasiewicz-Heldut, but he also stated that the information about the pending refund procedure, in his opinion, did not affect the course of the investment process. The testimony of this content clearly characterizes the approach of self-government bodies to the ongoing administrative proceedings for the return of a part of the property, belittling its importance and significance, as discussed in more detail below. Similarly, the conclusions can be drawn from the testimony of the witness Adam Niwiński – District Head of Leczna County (k 1151 - 1151 v) who answered the question "whether Mr. Wojtasiewicz's claims were taken seriously or trivial", he said that the purpose of the meeting in his cabinet was to ensure a smooth the process of issuing decisions - building permits.

However, the testimony given as a party by the Mayor of the Ludwin Commune - Andrzej Chabros (k 1151v-1153) deserves only part of the bestowal of faith. First of all, these fragments of his testimony, which are based on information obtained from third parties, or those that boil down to the legal interpretation of contractual provisions, are not convincing. However, the witness admitted that he had asked the inspector to check the cost and financial estimates presented by the plaintiff, which led to the approval of these cost estimates. Only some items of these cost estimates were questioned. It should be noted that the opinion of an expert in the field of construction was based on works that were not questioned by the defendant, which makes the expert's opinion credible.

18

Statements made as a plaintiff by the President of the Management Board of Sylwia Tamasiewicz-Heldut (k 1151 v) were irrelevant from the point of view of the substantive decision, because she had no knowledge of the investment and implementation of the provisions of the concluded contract.

Due to the need to have special messages in respect of the value of expenditures made by the party causing the defendant's property, the court allowed evidence of an expert opinion in the field of construction. In view of the motivated objections of the defendant, the District Court subsequently confirmed the supplementary opinion.

The expert thoroughly explained the premises that became the basis of the prepared opinion. Details showed the value of individual works and coefficients that formed the basis for establishing this size. In complementary opinions, he was also comprehensively referring to the doubts raised by the defendant, also taking into account partially raised allegations. However, the court had in mind that the expert erroneously classified the rent as the value of the investment, the amount of which was unchallenged between the parties. The rent is not an expense and cannot affect its amount. In the face of a transparent presentation by the expert of the methods for which he calculated the value of outlays, without including rent. Based on the data held, the court clarified the value of gross outlays in the amount of PLN 11,239,951.09 (PLN 13,388,089.15 x 84% -bo 16% consumption, k. 925)

The allegations submitted by the defendant to the opinion were of a polemical nature or referring to the legal assessment of the facts, which ultimately made it pointless to admit evidence from the opinion of another expert. The reference by a proxy of the defendant Gmina to the difference in calculations does not constitute grounds for refusing the integrity of an expert opinion. The material that formed the basis for preparing the opinion was complicated, and access to source materials was hindered. It cannot be overlooked that the scope of works for which the expert was based was approved by the defendant

annually in the course of rental settlements, and the defendant did not question the expert's scope or documents submitted to the expert *(protocol, k. 393).*

According to art. 278 § 1 of the civil code (k.p.c.), in cases requiring special knowledge, the court after hearing the parties' requests as to the number of experts and their choice, may summon one or several experts to seek their opinion. This proof, as emphasized in the case-law, is subject to review by the court pursuant to art. 233 § I of the civil code (k.p.c.), on the basis of the criteria for compliance with the principles of logic and general knowledge, the level of expert knowledge, theoretical foundations of opinions, and the manner of motivating and the degree of firmness of the conclusions expressed in it. It cannot be assumed that the court is obliged to admit evidence from subsequent experts whenever the opinion is unfavorable for the party. The need to appoint another expert should therefore result from the circumstances of the case, and not from the dissatisfaction of the party with the previous opinion submitted (judgment of the SA in Krakow of 31 January 2013, I ACa 1339/12).

Based on the above, the Court made findings of facts relevant to the decision in the case.

**The District Court considered the following:**

The plaintiff company demands the reimbursement of expenditures made by it and its legal predecessor on the basis of an agreement concluded as a result of submitting a declaration of will under the influence of an error, the consequences of which were repealed by submitting an appropriate statement.

The error was related to the circumstances specified in § 2 and 12 of the lease contract, i.e. providing the defendant with no encumbrances, property rights and liabilities of third parties and that he does not know about the circumstances excluding the use of real estate for the holiday resort and

20

granting the lessee the right to purchase the subject of the lease on the way of no - tender, on terms specified in separate regulations in the case of development based on a building permit.

The plaintiff said that they were inconsistent with reality, because in respect of the part of property, there was an administrative proceeding regarding the return of the property to the expropriated owners, about which the applicant's predecessor did not know.

Article 84 of the Polish Civil Code (k.c.) states that in the event of an error regarding the content of a legal transaction, it is possible to evade the legal consequences of his declaration of will. If, however, the declaration of will was made to another person, it may only be evaded from its legal effects if the error was caused by that person, even without her fault, or if she knew about the error or could have easily noticed the mistake; this limitation does not apply to the unpaid legal transaction (§ 1). One can only rely on an error justifying the supposition that if the declarant would not act under the influence of error and would judge the matter wisely, he would not submit a statement of that content, and thus a material error (§ 2).

Error on which an entity evading from effects is referred to incorrectly a declaration of will made must relate to a legal transaction and be relevant, unless it was triggered by a trick (Article 86 § 1 of the Polish Civil Code (k.c.)). The deliberate evocation of a mistake is the conscious act of the contractor aimed at evoking a misleading idea of reality.

In the opinion of the Court, this circumstance did not take place. From Sławomir Czubacki's testimony, it appears that the proceedings with Jerzy Wojtasiewicz's participation were belittled in the Commune, because his demands were not considered valid and meaningful. A similar conclusion can also be drawn from the testimonies of Zygmunt Ogorek, who indicated that he did not know whether any of the employees provided information about the refund procedure regarding part of lot no. 90, while he himself did not inform the participants of the negotiations. However, the witness Krystyna Florek

21

said that she would not consider such a claim to be a burden on real estate, so she did not see the need to include relevant information in tender offers, and the assurance provided in § 2 of the contract she considers to be correct. Commune activities in this respect should therefore be assessed as devoid of due care or diligence, however, the Court found no grounds to consider that they were directed at deliberately introducing the representatives of Antar LTD into error.

An error as to the content of a legal transaction means, in fact, an error as to the circumstances included in the content of that activity (for example, justification of the Supreme Court resolution of 18 November 1967, III CZP 59/67, OSNC 1968, No. 7, item 177). The determination of the content of a legal transaction and its components must be made taking into account the provisions of art. 56 k.c. Therefore, one cannot lose sight of the fact that a specific legal act constituting the subject of assessment evokes "not only the effects expressed in it, but also those that result from the act, principles of social coexistence and established customs". The mistaken idea that falls under the notion of error includes both the content of the statement (mistake) and other circumstances, such as facts to which the statement relates, legal norms applicable to the legal action carried out, or legal effects of the legal transaction (justification of the judgment Supreme Court of 19 October 2000, III CKN 963/98, OSNC 2002, No. 5, item 63).

The plaintiff's predecessor's error related to the factual circumstances connected directly with the legal status of the real estate that is the subject of the lease contract, in which the lessee has been granted the right to purchase the property after its previous construction. Therefore, there is no doubt that in the light of the above considerations, the error concerned the content of the legal transaction.

The second premise is the essential nature of the error, and therefore conditioning making a legal transaction.

22

In literature and case law, it is claimed that the error must be significant subjectively and objectively. The subjective significance of the error should be assessed taking into account the significance of the provisions whose mistake was related (usually the error concerning the characteristics of the subject of the service will be significant) for the person who made the statement. The significance of the error "must be (...) also objective, that is, the kind that a reasonably acting person who knows the true state of affairs would not make a declaration of will" (adopts the Supreme Court of 31.8.1989, III PZP 37/89, OSN 1990, No. 9, item 108). An objective assessment of the significance of an error consists in considering whether in the same circumstances a reasonable person would make a declaration of will if he did not act under the influence of error.

Assessment or error should be carried out based on the analysis of the content of the entire contract and other circumstances of its conclusion.

As it appeared from the testimonies of witnesses - Wieslaw Tokarz, Slawomir Czubacki and Andrzej Pawlak, ultimately the investor was going to buy real estate, however, due to concerns of the authorities of the Ludwin Commune regarding the possibility of dividing and selling the divided property, therefore the liquidation of the holiday resort, a lease agreement was concluded, the provisions of which clearly indicate that the lessee should adapt the property to the needs of a modern high-standard holiday resort (§ 1 point 4 of the contract), while limiting its right to return the equivalent of the expenditures made (§ 9 and 11 of the contract). In this way, the leased real estate, through adequate security and in accordance with the assumptions regarding the operation of the holiday resort and the construction of leased plots, obtained a guarantee of maintaining the existing character of the property. It is therefore obvious that an important condition for the conclusion of the contract was the future sale of real estate, which, however, under the conditions of pending proceedings for reimbursement, pursuant to art. 34 par. 3 of the Act of 21 August 1997 on real estate management (Journal of Laws of 2015, item 782, as amended) was not possible. Therefore, it should be considered that the company,

having information about pending proceedings, which excludes the sale of real estate, would not have concluded a lease agreement with similar content.

Thus, the error was significant and concerned the content of the legal transaction.

According to art. 84 § 1 second sentence, in the case of paid transactions, in addition, one of the three premises indicated in it must be fulfilled, namely the other party:

1) caused the error by, if only innocent behavior, or

2) knew about the error, or finally

3) could easily see the error.

The defendant not only did not reveal in the course of the negotiations that the property was in progress with recovery, but also ensured that there were no real estate encumbrances, therefore it is undoubted that the error was caused by it.

Article 88 § 1 of the Civil Code (k.c.) makes it possible to evade the legal consequences of a declaration of will which has been made to another person under the influence of an error or threat, by a declaration made to that person in writing.

Such a statement was made in a letter submitted to the Ludwin Commune on November 18, 2011 (k. 66 and n.).

On the basis of the present case, there arises the issue related to the lack of identity of the entity that made the declaration of will affected by the defect and the entity that made the declaration of evasion.

The plaintiff derives its right from the contract concluded with the previous tenant.

The change of the parties to the reciprocal contract is, in principle, admissible. In practice, it should take the form of a new contract concluded with the participation of a third party, in which there will be a simultaneous exemption from the contractual rights and obligations of the existing contractor. However, the acceptability of changing the parties to the contract is also accepted as a result of bilateral activities involving third parties that have the characteristics of transferring claims (art. 509 and n.) and a translative debt takeover (art. 519 and n. k.c.), while

24

the legal effectiveness of such activities depends on the preservation of the required form (see the verdicts of the Supreme Court of 6 November 1972, III CRN 266/72, OSN 1973, No. 9, item 160 and of June 17, 1999, I CKN 44/98, not public, the Court of Appeals in Poznan in the judgment of 21 April 2010, IA Ca 214/10).

By the power of a written agreement to transfer the rights and obligations from the lease agreement of September 23, 2009 (k. 24 and n.), which was not questioned by the defendant, Antar LTD limited liability company based in Lublin, transferred the rights and obligations to the plaintiff under the lease agreement of the JAGODA Holiday Resort on Lake Piaseczno. The Defendant granted the consent to the above-mentioned agreement, provided that the seat of the Solo Investment company was transferred to the Ludwin Commune, which, as is apparent from the excerpt from the Register of Entrepreneurs of the National Court Register attached to the petition *(k. 14-15),* occurred.

According to art. 509 § 2 k.c. the creditor may, without the consent of the debtor, transfer the claim to a third party (transfer), unless it would oppose the act, contractual clause or liability. Together with the claim, all rights related to it are transferred to the buyer, in particular a claim for compound interest (§ 2). In the light of art. 511 k.c. if the claim is confirmed by a letter, the transfer of this claim should also be confirmed by a letter. Art. 519 k.c. it provides that a third party may enter the place of the debtor who is released from the debt (§ 1). The debt can be taken over by a contract between the debtor and a third party with the consent of the creditor. A creditor's declaration may be made to any of the parties. It is ineffective if the creditor did not know that the person taking over the debt is insolvent (§ 2 point 2). The debt assumption contract should be in writing in case of nullity. The same applies to the creditor's consent to takeover debt (Article 522. k.c.).

In view of maintaining the required form and obtaining the consent of the Ludwin Commune, the change of the parties to the contract was legally effective.

25

The right to submit a statement on the evasion of the declaration of will made under the influence of error is legal and shaping, because it creates the competence of the authorized entity to unilaterally change or terminate the existing legal relationship (see Z. Radwanski, Civil Law - general part, CH Beck 2009, s. 90). However, it should be claimed that the subject of the transfer is not only the ability to require the debtor to fulfill the payment, because the transfer not only results in the succession of the claim itself, but also includes other elements that make up the creditor's situation. As a result, the assignee will obtain forming rights, among them the possibility of submitting a declaration under Art. 88 § 1 k.c. (see e.g. SN judgments of 28 November 2006, IV CSK 224/06, 22 April 2010, V CSK 376/09).

In view of the above, the plaintiff, in principle, was entitled to the right to evasion of the effects of a declaration on the conclusion of a lease contract.

Nevertheless, the defendant argued that due to the passage of time from the moment when the claimant (its legal predecessor) detected the permission, it expired.

According to art. 88 § 2 k.c. the right to repeal expires in the event of an error - within a year of its detection.

The deadline to avoid the legal consequences of the declaration of will made under the influence of an error starts running from the moment of its detection or the emergence of a state in which a rational person would realize that he acted under the influence of the error. According to the literal wording of the provision, only knowledge acquisition, and not the possibility of learning about an error is a legal event that results in the beginning of a period of intent. A narrow, literal interpretation of the provision would mean that a person who, due to his carelessness, did not notice a mistake, although a reasonable person should have noticed him in his place, would have had a longer period of avoidance of the declaration of will due to his carelessness (*Konrad Osajda, Code of Civil commentary*, CH Beck 2014, Biruta Lewaszkiewicz-Petrykowska, Commentary

to the Civil Code, LEX 2009, judgment of the SA in Cracow of July 22, 2014, I ACa 638/14, LEX No. 1566999). It should be pointed out that the interpretation of the provision of art. 88 § 2 k.c. remains in accordance with art. 355 § 2 of the Polish Civil Code (k.c.) which, although it directly refers to the debtor's performance of obligations, is also applicable in all legal relations with the participation of "professional" entities. The rule resulting from this provision obliges these entities to act with due diligence in the scope of their business activity, taking into account the professional nature of this activity.

There is no doubt that the Commune did not provide, in its official form, information about the proceedings aimed at returning the property to the previous owners. Nevertheless, the plaintiff, already in 2008, received information that part of the leased property is subject to such proceedings. The company, as can be seen from the attached photocopies of documents in the files of the proceedings kept by the Minister of Infrastructure (BO1d/782-R-124/07), was notified of the need to provide plot no. 90 for the inspection on June 13, 2008; in the text of the notification *(k. 891)*, it was pointed out that the proceedings concerning the annulment of the decision of the President of the Housing and Urban Development Office of March 22, 2000, sign PO.5.1-O-85/99, which upheld the decision of the Lublin Voivode of December 14, 1998 (sign GKN.GW.7221-2/76/98), refusing to return the property located in the town of Rozplucie - Grabow, marked as plot No. 285, area of approx. 3.21 ha. It was further indicated that it is now part of plot No. 90, area of 9.14 ha, and the authority conducting the proceedings was obliged to determine the implementation of the expropriation of the former plot No. 285. The request for this content was collected at the office of Antar LTD by its worker on May 27, 2008 (k. 893). The plaintiff's proxy did not comment on the contents of these documents, he did not question them, and the analysis of all material collected in the case indicates that the letter was received by the same person who received correspondence sent from the Leczna County at other times, therefore, there is no

27

indication that it was an unauthorized or accidental person. It should also be pointed out that the correspondence came from the body directly conducting proceedings in the case, so it is difficult to assume that it did not contain reliable or truthful information. What's more, even if they were not enough for the company, they should give rise to actions to clarify this issue. The position is not accepted, according to which the professional ignores the relevant circumstances of his business activity, to rely after some time its ignorance in this regard.

The above indicates that correspondence was delivered to the address of Antar LTD, which contained information allowing for the detection of an error. Also, the decisions issued in the course of proceedings conducted by the Leczna County included in their content information on the proceedings regarding the return of the expropriated property designated as a former plot of land no. 285, and now part of the lot no. 90.

A separate issue, strongly accentuated by the defendant, was participation in a review of the real estate in June 2008 of Wieslaw Tokarz and Marek Pawlowski, who presented the authorization to the authorities from the board of Antar LTD. Both Wieslaw Tokarz and Andrzej Pawlak testified that the authorization submitted during the inspection was a one-off authorization, issued according to specific needs. Since Antar LTD was informed about the inspection, and Wieslaw Tokarz had the authorization issued on the day preceding the act, which he presented to the representatives of the Ministry of Infrastructure conducting the inspection, it means, in the light of logic, that it was granted to him in connection with this particular act, which he submitted it. Thus, it should be considered that he acted on behalf of the lessee during this operation. The proof of the truth of this assumption may also be the fact that he sought information from the employees of

the Commune Office regarding the results of the inspection and such information, although quite general in nature, was obtained and handed over to the president of Antar.

A number of presented circumstances lead to the conclusion that the legal predecessor of the claimant could have detected the error already in 2008, which would lead to the conclusion that the action has been corrected, due to the ineffective passage of time to avoid the effects of the declaration of will made under the influence of error.

Nevertheless, it should be pointed out that the legal predecessor of the plaintiff acted on the basis of the assurances of its contractor, territorial self-government unit, which denied the existence of any doubts as to the legal status and, consequently, the possibility of selling the property located on Lake Piaseczno. Therefore, the tenant's conduct cannot be assessed in isolation from these circumstances. Since it is undisputed that in the text of the real estate lease notices the proceedings regarding the return of real estate were not provided, such information was also not provided in the course of the negotiations, but also after the contract was concluded, the plaintiff had grounds to be convinced that such circumstances do not occur, and consequently, do not treat messages contained in correspondence addressed to the company from the Ministry of Infrastructure, or Leczna County, as regarding facts affecting the implementation of contractual provisions. Both in doctrine and jurisprudence, it is assumed that an error may refer to both factual and legal circumstances (such as the Supreme Court in its judgment of 6 June 2003, IV CK 274/02, Lex No. 146440 and of 5 December 2000, IV CKN 179/00, Lex No. 52505), and in respect of the latter, the plaintiff company was still in the wrong opinion, and the error in this respect was not detected until the Mayor of the Ludwin Commune gave formal information that in fact the proceedings regarding the return of a part of the leased property *(k. 58),* which allowed to consider this circumstance as relevant.

29

Assuming the current and fixed views on the essence of error as the difference between the state imagined by the declaration of will and the real state, based in the field of error in law on the interpretation and practice of applying the law, the detection of error should be understood as the abolition of this difference. To achieve this state, it is necessary to recognize the actual state and change the current image. Learning about the existence of discrepancies begins only with the cognitive process aimed at determining what the differences concern and what is the real state. Since the detection of an error is a reliable moment for making a decision to avoid its effects, it is necessary to get to know them in error at least to the extent that the declarant is able to assess the significance of the error (see judgment of the Supreme Court of 6 June 2003, IV CK 274/02, LEX No. 146440)

The letter containing the relevant information is dated September 22, 2011 while the declaration on the evasion of the effects of the declaration of will made under the influence of the error took place on November 18, 2011, when the plaintiff filed an appropriate letter to the Ludwin Commune *(k. 66 and n.)*, so that the required deadline was met. As a consequence of the effective evasion of the legal consequences of a declaration of will to conclude a lease agreement that provided for making outlays on property, the plaintiff demands to return their equivalent.

Effective evasion of the legal consequences of the declaration of will made under the influence of error makes the contract invalid *ex tunc*. The benefit fulfilled in the performance of such a contract is an undue payment (art. 410 § 2). The basis for demanding its return are provisions on unjust enrichment in connection with art. 410 § 1 c.c. (judgment of the Supreme Court of 9 February 1998, III CKN 372/97, LexPolonica No. 343981).

Article 410 § 1 and 2 in conj. from art. 405 k.c. obliges you to return in kind, and if it is not possible, to refund the value of the benefit obtained unduly. The benefit is not due if the person who fulfilled it was not obliged

at all or was not obliged towards the person it provided, or if the basis for the benefit was not fulfilled or the intended purpose of the benefit was not achieved, or if the legal act obliging to perform the service was invalid and not became valid after the performance was fulfilled.

The fact that the plaintiff and its predecessor made outlays was not contentious. Basically, in the course of the trial, the defendant did not question the scope of the work but only their value due to the fact that it was not determined based on as-built cost estimates drawn up on the basis of the acceptance protocols of the work conducted.

In the course of the trial, however, the plaintiff presented documents confirming the Ludwin Commune's approval of the cost and scope of the works performed, and the as-built cost estimates underlying the preparation of these documents (and in the course of the proceedings being the basis for the expert to issue an opinion) were submitted to the Ludwin Commune for verification by a specialist appointed by the defendant for this purpose, has been proved in the course of testimonies by Krystyna Florek and Miroslaw Wozniak.

Since, therefore, a way of verifying the works carried out was accepted between the parties to the present proceedings, the Commune considered it correct and did not question the number of works carried out at the co-operative stage, and at the stage of the court proceedings did not indicate any circumstances suggesting an irregularity of the previously established scope of expenditures, the assessment of the legitimacy of the allegations presented by the defendant and the assessment of the documents submitted by the plaintiff as evidence of the expenditures made, should lead to the conclusion that the defendant's allegations are made not due to actual objections, but only due to the defendant Commune's process strategy.

In view of the set scope of works, it was necessary to determine their value. How it is indicated in the jurisprudence (see e.g. the judgments of the Supreme Court of March 12, 1998, CSK 522/97, OSNC 1998/11/176 and of October 3, 2003, III CKN 1313/00,

no public, of 1 December 2010, I CSK 64/10), if the return of unjust enrichment is to take place in money, then if an action of adjudication is upheld, the current enrichment is refunded, which should be understood in accordance with Art. 405 k.c. in conjunction with art. 316 k.p.c. and applied by analogy to art. 363 § 2 k.c., return enrichment existing at the time of the verdict. This position is shared by the court hearing the case.

It was necessary to determine the value of outlays, taking into account the degree of their consumption, so that the current value of enrichment of the defendant could be indicated, which required special information.

The expert in the field of construction in his opinion, taking into account only the expenditure approved by the defendant, gave the net and gross value of the expenditures made *(k 925)*.

The Commune's defendant disputed the possibility of adjudicating to the plaintiff the amount including VAT, arguing that some of the work was performed by the claimant's employees, i.e. the economic method.

Referring to this allegation, it should be pointed out that the outlays on real estate, to be returned, on the basis of art. 8 sec. 1 of the Act of March 11, 2004 on Value Added Tax (ie, Journal of Laws of 2011 No. 177, item 1054, as of 111) are treated by the tax authorities as paid services, and these in accordance with art. 5 para. 1 of the above-mentioned Act are subject to tax on goods and services, also in the case when the obligation to return their value results from the provisions on unjust enrichment, if the active VAT taxpayer is concerned (see judgment of the Supreme Administrative Court of 10 May 2011, I FSK/743/11). Such an understanding of the concept is related to the content of the provision of art. 47 § 1 k.c. & 48 k.c., which results in connection with the ownership of the land of its constituent parts, therefore things permanently connected with it, to which the buildings and structures erected by the plaintiff belong undoubtedly. A similar position, in the present case, was taken by the Minister of Finance in an individual tax interpretation of August 28, 2014, issued through the Director of the Tax Chamber in

32

Lodz (sign IPTPP2/443-418/14-3/JN), which the plaintiff has attached to the case file (*k. 974-976*). It is irrelevant that he misinterpreted the concept of withdrawal from the contract. For these reasons, it is irrelevant whether the plaintiff performed work through his employees or the method of commissioning of work to other entities, because the whole provision of outlays is a service. The result of the above is the statement that the benefit awarded in the case in question will be connected with the obligation to pay VAT by the plaintiff company. In accordance with the provisions of art. 3 par. 1 point 1 in zw. from paragraph 2 of the Act on information about prices of goods and services of 9 May 2014 (Journal of Laws of 2014, item 915), the buyer is obliged to pay to the entrepreneur for the service a price that includes tax on goods and services. The above requires, therefore, VAT to be taken into account in the amount awarded by the plaintiff, and thus the gross price set by the expert.

Resolution on the interest the Court based its content on art. 481 in conjunction from 455 k.c. The plaintiff evaded the effects of the declaration of will to conclude a lease agreement in a letter lodged with the defendant Commune on November 18, 2011, at the same time appointing its 14-day deadline for return, thus marking the date of performance. Thus, according to the call, interest should be due from December 3, 2011.

However, the fact that the amount of enrichment is determined as at the date of the award, does not imply the payment of interest from that date. Court proceedings are a consequence of negating by the defendant Commune the obligation to fulfill the obligation, which, however, is not tantamount to the lack of its maturity, and determining the value of return of undue payment according to the state of judgment is an expression of the amount of enrichment at the time of return. The provisions on undue payment refer to the actual benefit obtained by the enriched equivalent at the time of return, as evidenced, for example, by the provision of art. 409 c.c. The defendant was obliged to return the benefit to the claimant in accordance with the regulations indicated in the law, with the date specified in the request for payment. There is

33

therefore no reason to limit the obligation to pay interest on the defendant.

Decision on the costs of the trial the court based the content of art. 102 k.p.c., in accordance with which he charged the defendant Commune with the obligation to reimburse the costs incurred by the plaintiff, i.e. fees from the claim in the amount of PLN 10,000.00 and advances paid at the expense of expert opinions in the total amount of PLN 11,562.12. In the opinion of the Court, only such a division of the costs of the proceedings, excluding the costs of legal representation incurred by the parties, guarantees the implementation of the principle of equity, referred to in the above-mentioned art. 102 k.p.c. It should also be borne in mind that charging the municipality with the obligation to pay a large sum of money as a reimbursement of expenses, and at the same time the obligation to reimburse the costs incurred by the opponent, may lead to a difficult financial situation for the Commune and render the development plans of the Commune and its residents impossible.

Other, unpaid costs in the form of a portion of the claim fee, have been taken over pursuant to article 113, paragraph 3 of the Act on court costs in civil cases for the account of the Treasury.

For the reasons given above and for the cited content the law has been adjudicated by the court as in the operative part of the judgment.

# ORIGINAL

Sygn. akt **I C 28/12**



# WYROK
## W IMIENIU RZECZYPOSPOLITEJ POLSKIEJ

Dnia 29 grudnia 2015 r.

Sąd Okręgowy w Lublinie I Wydział Cywilny
w składzie:

**Przewodniczący:** SSO Maria Stelska

**Protokolant:** Edyta Stanisławek-Krukowska

po rozpoznaniu na rozprawie w dniu 1 grudnia 2015 roku w Lublinie

**sprawy z powództwa** Solo Investment Spółki z ograniczoną odpowiedzialnością z siedzibą w Rozpłuciu Pierwszym

**przeciwko** Gminie Ludwin

o zapłatę

I. zasądza od pozwanej Gminy Ludwin na rzecz Solo Investment Spółki z ograniczoną odpowiedzialnością z siedzibą w Rozpłuciu Pierwszym kwotę 11.239.951,09 ( jedenaście milionów dwieście trzydzieści dziewięć tysięcy dziewięćset pięćdziesiąt jeden 09/100) z ustawowymi odsetkami od dnia 3 grudnia 2011 roku do dnia zapłaty;

II. w pozostałej części powództwo oddala;

III. zasądza od pozwanej Gminy Ludwin na rzecz Solo Investment Spółki z ograniczoną odpowiedzialnością z siedzibą w Rozpłuciu Pierwszym kwotę 21.652,12 ( dwadzieścia jeden tysięcy sześćset pięćdziesiąt dwa 12/100) złotych tytułem częściowego zwrotu kosztów procesu;

1

Sygn. akt I C 28/12

## UZASADNIENIE

Pozwem z dnia 13 stycznia 2012 r. *(pozew, k. 2 i n.)* powód Solo Investment Spółka z ograniczoną odpowiedzialnością z siedzibą w Rozpłuciu Pierwszym wniósł o zasądzenie od pozwanej Gminy Ludwin kwoty 13.889.256,46 zł wraz z ustawowymi odsetkami od dnia 17 listopada 2011 r. do dnia zapłaty tytułem zwrotu wartości nakładów poniesionych przez powoda i jego poprzednika prawnego na nieruchomość stanowiącą własność pozwanej Gminy, w wykonaniu nieważnej „Umowy Dzierżawy Ośrodka Wypoczynkowego JAGODA nad Jeziorem Piaseczno" z dnia 15 lutego 2007 r. zawartej pod wpływem błędu istotnego, podstępnie wywołanego przez przedstawiciela Gminy Ludwin i dotyczącego treści czynności prawnej.

Powód wniósł również o zasądzenie od pozwanej na swoją rzecz kosztów procesu, w tym kosztów zastępstwa procesowego.

Uzasadniając swoje żądanie podał, że dnia 15 lutego 2007 r. pomiędzy Gminą Ludwin a ANTAR Ltd. Spółką z ograniczoną odpowiedzialnością reprezentowaną przez prezesa zarządu Andrzeja Pawlaka została zawarta umowa dzierżawy Ośrodka Wypoczynkowego JAGODA nad Jeziorem Piaseczno, obejmująca działki o łącznej powierzchni 9,19 ha oznaczone w ewidencji gruntów wsi Rozpłucie Pierwsze numerami 90 i 94/2.

Pozwana w umowie zapewniła, że jest właścicielem w/w nieruchomości na mocy decyzji Wojewody Lubelskiego z 1991 r., zgodnie z miejscowym planem zagospodarowania przestrzennego Jeziora Piaseczno traktowanej jako teren usług turystycznych, nieruchomość zaś wolna jest od obciążeń, a Gmina nie wie o żadnych okolicznościach wykluczających wykorzystywanie nieruchomości na prowadzenie ośrodka wypoczynkowego. Celem umowy było przystosowanie nieruchomości na potrzeby nowoczesnego Ośrodka Wypoczynkowego o

1

wysokim standardzie, gdzie osoby wypoczywające będą mogły mieć udostępnione kompleksowe usługi w zakresie rekreacji fizycznej i psychicznej. Powód został zobligowany do ponoszenia nakładów na nieruchomość, zaś pozwany wyraził zgodę na potrącenie udokumentowanych nakładów z czynszu dzierżawnego. Ustalenie wysokości nakładów miało następować na podstawie kosztorysu inwestorskiego. W umowie zapewniono również prawo nabycia przedmiotu dzierżawy w drodze bezprzetargowej na zasadach określonych w odrębnych przepisach.

Zgodnie z umową dzierżawca (zarówno pierwotny- spółka ANTAR jak i jego następca prawny- a więc powodowa spółka) zabudował nieruchomość, zaś wartość nakładów wyniosła 13.889.256,46 zł.

Pismem z dnia 12 sierpnia 2011 r. prezes zarządu spółki Solo Investment sp. z o.o. skierował do Gminy Ludwin wezwanie do zawarcia umowy sprzedaży dzierżawionej nieruchomości w trybie sprzedaży bezprzetargowej wyznaczając datę jej zawarcia. Jednocześnie zwrócił się z wnioskiem o przekazanie pełnej dokumentacji dotyczącej aktualnego stanu prawnego nieruchomości.

Opowiadając na wezwanie Gmina wskazała, że roszczenie w trybie sprzedaży bezprzetargowej powód posiada jedynie w sytuacji podjęcia decyzji o sprzedaży działki, natomiast Gmina Ludwin nie sprzedaje aktualnie nieruchomości.

Powódka domagała się również zaktualizowania w księdze wieczystej nr LUI1/00141599/3 stanu prawnego dotyczącego działki nr 94/2 o pow. 0,0454 ha, która w księdze wskazana jest jako własność WPT „Lublinianka" w Lublinie. W piśmie z dnia 22 września 2011 r. pozwana poinformowała powoda o toczącym się od 1991 r. postępowaniu rewindykacyjnym dotyczącym części nieruchomości nr 90.

Wobec tej informacji prezes Solo Investment sp. z o.o. zaproponował rozwiązanie umowy za porozumieniem stron i zwrotem nakładów przez powoda poczynionych na nieruchomość, a nie zaliczonych na poczet czynszu.

2

Pozwana w piśmie z dnia 13 października 2011 r. wskazał, że nie wyraża zgody na rozwiązanie umowy dzierżawy za porozumieniem stron wraz ze zwrotem nakładów.

Pismem z dnia 17 listopada 2011 r. prezes zarządu Solo Investment sp. z o.o. złożył Wójtowi Gminy Ludwin pisemne oświadczenie o uchyleniu się od skutków oświadczenia woli o zawarciu umowy dzierżawy nieruchomości złożonego pod wpływem błędu, wynikającego z nieprawdziwych zapewnień pozwanej o tym, że nieruchomość jest wolna od obciążeń i praw rzeczowych oraz zobowiązań osób trzecich oraz, że nie wie o  żadnych okolicznościach wykluczających wykorzystanie nieruchomości na prowadzenie ośrodka wypoczynkowego oraz nieprawdziwym zapewnieniu o prawie nabycia przedmiotu dzierżawy w trybie bezprzetargowym.

Stanowisko to popierane było w dalszych pismach procesowych, w szczególności w piśmie z dnia 5 grudnia 2012 r. *(k. 239 i n.)*, w którym wskazał, że obowiązek zwrotu nakładów opiera się o konstrukcję zwrotu nienależnego świadczenia.

W odpowiedzi na pozew *(k. 94 i n.)* pozwana powództwa nie uznała wnosząc o jego oddalenie w całości. Domagała się także zasądzenia na swoją rzecz kosztów procesu, w tym kosztów zastępstwa procesowego wg norm przepisanych.

Wskazała, że powódka nie zachowała rocznego terminu na złożenie oświadczenia woli o uchyleniu się od skutków oświadczenia złożonego pod wpływem błędu. Podała, że powódka o postępowaniu administracyjnym w przedmiocie zwrotu nieruchomości wiedziała przed przekazaniem jej tej informacji przez Wójta pismem z dnia 22 września 2011 r., nie później niż w dacie 2 kwietnia 2008 r.

Nadto podała, że wszystkie zapisy umowne, zarówno w dacie podpisania umowy jak i w dniu sporządzania odpowiedzi na pozew zgodne były ze stanem faktycznym i prawnym, dlatego twierdzenia o podstępnym wprowadzeniu błąd są

3

bezzasadne. Z tych względów, w ocenie pozwanego, umowa dzierżawy pozostaje w mocy, w związku z czym roszczenie z tytułu bezpodstawnego wzbogacenia jest bezpodstawne. Z ostrożności procesowej pozwana Gmina zakwestionowała wysokość nakładów poniesionych przez powoda.

W związku z wywołaną w sprawie opinią biegłego z zakresu budownictwa, pozwana podniosła, że przy uwzględnianiu wysokości nakładów należy uwzględnić zwrot dokonanych przez stronę odliczeń od podatku należnego o podatek naliczony, a nadto, że z uwagi na wykonanie części prac przez pracowników powoda nie należy uwzględniać podatku VAT *(pisma, k. 720-729, 744-775, 776-780, 881-890, 907-910, 958-965, 986-990, 1009-1013)*

W odpowiedzi powód wskazywał, że w polskim systemie prawnym nie funkcjonują rozliczenia netto, zaś w przypadku uznania przez Sąd powództwa, nastąpi sytuacja zwrotu poniesionych nakładów, a kwoty zwrotu nie będzie można pomniejszyć o naliczony wcześniej podatek VAT, gdyż taka operacja jest niedozwoloną formą pomniejszania wpływów budżetowych do Skarbu Państwa w postaci nieodprowadzenia podatku VAT. Nadto podał, że bez znaczenia pozostaje to, że część prac wykonana była przez pracowników powoda i jego poprzednika, bowiem ich praca to również nakład, zaś pracodawca musiał wypłacić im wynagrodzenie i nie mógł wyznaczyć do innych robót. *(pisma, k. 764-767, 793-801, 834-837, 970-973, 1056-1060)*

### Sąd Okręgowy ustalił następujący stan faktyczny:

W dniu 15 lutego 2007 r. pomiędzy „Antar LTD" spółką z ograniczoną odpowiedzialnością z siedzibą w Lublinie, reprezentowaną przez Andrzeja Pawlaka- prezesa zarządu spółki, a Gminą Ludwin reprezentowaną przez Wójta-Zygmunta Ogórka, zawarta została umowa dzierżawy, mocą której Gmina Ludwin wydzierżawiła spółce Antar Ltd nieruchomość złożoną z działek oznaczonych w ewidencji gruntów wsi Rozpłucie Pierwsze nr 90 i 94/2 o łącznej powierzchni 9,19 ha zabudowaną pensjonatem na 50 miejsc noclegowych, barem szybkiej obsługi i budynkiem gospodarczym oraz obejmującą pole namiotowe z

4

wyłączeniem pasa gruntu o szerokości 2mb, licząc od siatki ogrodzeniowej od strony północnej, z przeznaczeniem na ciąg pieszy. Umowa została zawarta na okres od 1 marca 2007 r. do 31 grudnia 2032 r.

Dzierżawca zobowiązał się wykorzystywać przedmiot dzierżawy na prowadzenie działalności gospodarczej. Zgodnie z jego oświadczeniem, celem zawarcia umowy było przystosowanie nieruchomości na potrzeby nowoczesnego Ośrodka Wypoczynkowego o wysokim standardzie, gdzie osoby wypoczywające będą mogły mieć udostępnione kompleksowe usługi w zakresie rekreacji fizycznej i psychicznej, zgodnie z koncepcją programowo-przestrzenną ośrodka rekreacji letniej nad Jeziorem Piaseczno, stanowiącej załącznik nr 3 do umowy (§1 umowy).

W § 2 umowy wydzierżawiająca Gmina oświadczyła, że nieruchomość jest wolna od obciążeń i praw rzeczowych oraz zobowiązań osób trzecich oraz, że nie wie o żadnych okolicznościach wykluczających wykorzystanie nieruchomości na prowadzenie Ośrodka Wypoczynkowego.

W umowie dopuszczono możliwość cesji praw i obowiązków dzierżawcy wynikających z umowy na rzecz podmiotu powiązanego z dzierżawcą (§5 pkt 3 umowy).

Dzierżawca zobowiązał się do płacenia czynszu dzierżawnego w wysokości 50.000 zł brutto za 12-miesięczny okres rozliczeniowy, który miał być modyfikowany corocznie do dnia 31 marca każdego roku, na podstawie stopnia inflacji przyjętego w ustawie budżetowej na dany rok (§7).

W § 9 umowy dzierżawca zobowiązał się do ponoszenia nakładów na nieruchomość, a wydzierżawiający wyraził zgodę, by udokumentowane przez dzierżawcę nakłady własne na nieruchomość były potrącane z czynszu dzierżawnego. W przypadku przekroczenia przez kwotę nakładów kwoty czynszu w danym roku, różnica miała zostać uwzględniona w latach następnych.

Strony zdefiniowały nakłady jako nakłady inwestycje w toku przystosowywania nieruchomości do użytkowania jako nowoczesnego Ośrodka Wypoczynkowego, w toku użytkowania nieruchomości i eksploatacji obiektu oraz koszty wymiany, przebudowy i rozbiórki zużytej infrastruktury, wyburzania i budowy nowych budynków, budowli i innych obiektów budowlanych.

W umowie wydzierżawiający wyraził zgodę do przystosowania nieruchomości do użytkowania jako nowoczesny ośrodek wypoczynkowy poprzez wymianę, przebudowę i rozbiórkę zużytej infrastruktury, wyburzenia i budowy

Wysokość nakładów podlegających zaliczeniu na rzecz czynszu dzierżawnego miała następować każdorazowo przed ich poniesieniem na podstawie kosztorysu inwestorskiego.

W § 12 umowy strony ustaliły, że dzierżawcy przysługuje prawo nabycia przedmiotu dzierżawy w drodze bezprzetargowej na zasadach określonych w odrębnych przepisach (w przypadku zabudowy na podstawie zezwolenia na budowę).

*(umowa dzierżawy Ośrodka Wypoczynkowego JAGODA nad Jeziorem Piaseczno z dnia 15 lutego 2007 r., k. 17-20)*

W dniu 28 lutego 2007 r. na podstawie protokołu zdawczo-odbiorczego wydzierżawiający przekazał dzierżawcy nieruchomość określoną w umowie *(protokół zdawczo-odbiorczy, k. 22)*

Na podstawie umowy zawartej 23 września 2009 r. Antar LTD spółka z ograniczoną odpowiedzialnością z siedzibą w Lublinie przeniosła na rzecz Solo Investment spółki z ograniczoną odpowiedzialnością z siedzibą w Warszawie prawa i obowiązki przysługujące spółce Antar LTD, wynikające z umowy dzierżawy Ośrodka Wypoczynkowego Jagoda nad Jeziorem Piaseczno z dnia 15 lutego 2007 r. zwartej pomiędzy Gminą Ludwin a Antar LTD sp. z o.o. Wójt Gminy Ludwin udzielił zgody na w/w cesję pod warunkiem przeniesienia

siedziby spółki Solo Investment na teren Gminy Ludwin. Spółka obecnie ma siedzibę w Rozpłuciu Pierwszym, na terenie Gminy Ludwin.

*(umowa przeniesienia praw i obowiązków z umowy dzierżawy, k. 24-28, pismo GN 7224/9-11/07/09, k. 29, odpis z rejestru Przedsiębiorców KRS z dnia 22 grudnia 2011 r., k. 14-15)*

Po przekazaniu nieruchomości spółka rozpoczęła inwestycje. Po zakończeniu poszczególnych etapów prac na terenie ośrodka dzierżawca przedstawiał pozwanej Gminie kosztorysy powykonawcze, które były weryfikowane przez osobę posiadającą stosowne uprawnienia. Pozwany zatwierdził nakłady poniesione w okresie od 1 marca 2007 r. do 1 marca 2011 r. na łączną kwotę 13.889.256,46 zł. Z kwot tych dokonano potrąceń czynszu za lata 2007- 2011 r. na łączną kwotę 287.354,63 zł *(pisma, k. 37-43, zeznania Mirosława Woźniaka, Krystyny Florek, Wiesława Tokarza, k.252-254, płyta CD, k. 255, w zakresie czynszu okoliczności bezsporne).*

Łączna wartość robót wykonanych na nieruchomość, na której prowadzony jest ośrodek wypoczynkowy nad Jeziorem Piaseczno wyniosła 11.481.329,10 zł brutto (9.138.171,62 zł netto)

*(opinia i opinie uzupełniające biegłego z zakresu budownictwa wraz z załącznikami, k. 381-636, 711-714, 756v-758, 922-951, 994-997, ustna opinia uzupełniająca, k.1036v-1037)*

Pismem z dnia 12 sierpnia 2011 r. powódka wezwała pozwaną Gminę do zawarcia umowy w trybie sprzedaży bezprzetargowej nieruchomości obejmującej działki nr 90 i 94/2, dla których Sąd Rejonowy Lublin-Wschód z siedzibą w Świdniku prowadzi księgi wieczyste o nr (odpowiednio) LU1I/00135980/6 oraz LU1I/00141599/3, powołując się na § 12 umowy za cenę 14.950.000,00 zł pomniejszoną o wartość nakładów poniesionych od 2007 r. przez dzierżawców, a więc kwotę 13.889.256,46 zł. Tym samym cenę ustalono na kwotę 1.060.743,54 zł, a powiększoną o wartość czynszu dzierżawnego uprzednio potrącanego z nakładów w łącznej kwocie 287.354,63 zł, a więc ostatecznie za cenę

7

1.348.098,17 zł. Jako termin zawarcia umowy powódka wskazała dzień 5 września 2011 r.

Wniosła również o przekazanie jej pełnej i udokumentowanej informacji na temat aktualnego stanu prawnego przedmiotowej nieruchomości.

W odpowiedzi Wójt pozwanej Gminy podał, że stosownie do przepisów ustawy o gospodarce nieruchomościami z dnia 21 sierpnia 1997 r. nieruchomości stanowiące własność gminy mogą być sprzedawane w drodze bezprzetargowej jedynie w przypadkach określonych w ustawie, gdy właściciel podejmie decyzję o sprzedaży, czego Gmina Ludwin nie planuje.

Przedstawiciel pozwanej Gminy nie stawił się we wskazanej kancelarii notarialnej w celu zawarcia umowy.

Powódka ponowiła wezwanie do przedstawienia informacji w przedmiocie stanu prawnego nieruchomości oraz wezwała Gminę Ludwin do aktualizacji stanu prawnego działki nr 94/2, z uwagi na wpisanie w księdze wieczystej jako właściciela WPT „Lublinianki" w Lublinie, nie zaś Gminy Ludwin.

Wójt Gminy Lublin, w piśmie z dnia 22 września 2011 r. podał, że Gmina jest właścicielem całej nieruchomości, zaś oświadczenia zwarte w umowie, a dotyczące stanu prawnego nieruchomości zgodne były ze stanem faktycznym i prawnym. Nadto podał, że od 1991 r. toczy się postępowanie administracyjne o zwrot nieruchomości stanowiącej część działki nr 90, wszczęte z wniosku byłego właściciela.

W piśmie z dnia 12 października 2011 r. Solo Investment sp. z o.o. wezwała Gminę Ludwin do rozwiązania umowy dzierżawy na zasadzie porozumienia stron w ciągu 14 dni od doręczenia wezwania i do zwrotu wartości nakładów poczynionych przez dzierżawcę na nieruchomość, nie zaliczonych uprzednio na poczet czynszu, pomniejszoną o łączną wysokość należnego pozwanej czynszu, a więc ostatecznie kwoty 13.592.363,00 zł.

Uzasadniła powyższe działaniami pozwanej, w szczególności odmową sprzedaży dzierżawionej nieruchomości, które doprowadziły do przekreślenia podstaw prawnych, gospodarczej celowości i zasadności kontynuacji umowy dzierżawy.

Gmina Ludwin nie wyraziła zgody na rozwiązanie umowy za porozumieniem stron.

W piśmie przedstawionym pozwanej Gminie dnia 18 listopada 2011 r. powódka, jako następca prawny Antar LTD spółki z ograniczoną odpowiedzialnością w Lublinie i dzierżawca nieruchomości położonej w miejscowości Rozpłucie Pierwsze, obejmującej działki o nr 90 i 94/2 złożyła oświadczenie o uchyleniu się od skutków prawnych oświadczenia woli o zawarciu umowy dzierżawy Ośrodka Wypoczynkowego „JAGODA" nad Jeziorem Piaseczno z dnia 15 lutego 2007 r., złożonego pod wpływem istotnego błędu, podstępnie wywołanego przez Gminę Ludwin i dotyczącego treści czynności prawnej, a polegającego na:

1. nieprawdziwym zapewnieniu w treści § 2 w/w umowy: „wydzierżawiający oświadcza, iż wskazana w § 1 nieruchomość jest wolna od obciążeń i praw rzeczowych oraz zobowiązań osób trzecich oraz nie wie o żądnych okolicznościach wykluczających wykorzystywanie nieruchomości na prowadzenie ośrodka wypoczynkowego"

2. nieprawdziwym zapewnieniu w treści § 12 w/w umowy „Dzierżawcy przysługuje prawo nabycia przedmiotu dzierżawy w drodze bezprzetargowej na zasadach określonych w odrębnych przepisach (w przypadkach zabudowy na podstawie zezwolenia na budowę)".,

podczas gdy Gmina nie przewiduje sprzedaży nieruchomości, zaś co do jej części toczy się postępowanie rewindykacyjne, co wyklucza możliwość faktyczną i prawną nabycia tej nieruchomości.

9

Solo Investment spółka z ograniczoną odpowiedzialnością wezwała do zwrotu na swoją rzecz wartości nakładów w kwocie 13.889.256,46 zł w terminie 14 dni od otrzymania wezwania.

*(pismo z dnia 12 sierpnia 2011 r., k. 45-49, pismo z dnia 29 sierpnia 2011 r., GN.6845.1.2011, k. 51, protokół stawiennictwa jednej strony i niestawiennictwa drugiej strony, k. 53-54, pismo z dnia 15 września 2011 r., k. 56, pismo z dnia 22 września 2011 r., GN.6845.1.2011, k. 58, pismo z dnia 11 października 2011 r., k. 60-62, pismo z dnia 13 października 2011 r., GN.6845.1.2011, k. 64)*

Następnie, w dniu 27 lutego 2012 r., wezwano pozwaną Gminę do stawienia się celem przekazania nieruchomości. Gmina Ludwin w odpowiedzi, datowanej na 1 marca 2012 r. podała, że podtrzymuje stanowisko wyrażone w piśmie z dnia 1 grudnia 2011 r. Wobec niestawiennictwa przedstawicieli Gminy we wskazanym dniu, powódka sporządziła protokół stawiennictwa jednej i niestawiennictwa drugiej stronny w celu przekazania nieruchomości, podpisany przez trzech świadków. Bez obecności pozwanej, w obecności wskazanych świadków, dokonała protokolarnego przekazania nieruchomości. Protokoły przedłożyła Gminie Ludwin. Z § 2 lit. g protokołu przekazania nieruchomości wynika, że spółka uznaje czynność przekazania za dokonaną. Pozwana Gmina jednak czynności nie uznała wskazując, że umowa dzierżawy z dnia 15 lutego 2007 r. nadal obowiązuje.

*(pismo z dnia 24 lutego 2012 r., k. 231, pismo z dnia 1 marca 2012 r., k. 232, informacja o sporządzonych protokołach, k. 233, protokół stawiennictwa jednej i niestawiennictwa drugiej stronny w celu przekazania nieruchomości, k. 234, protokół przekazania nieruchomości z dnia 5 marca 2012 r., k. 235-236, pismo z dnia 16 marca 2012 r., k. 237)*

Od 1991 r., w odniesieniu do części działki nr 90, dawniej oznaczanej w ewidencji gruntów i budynków jako działka nr 285, toczyło się postępowanie administracyjne i sądowo-administracyjne dotyczące zwrotu nieruchomości na

rzecz poprzednich właścicieli wywłaszczonych w latach siedemdziesiątych, obecnie w osobie ich spadkobiercy- Jerzego Wojtasiewicza.

*(okoliczności bezsporne, zeznania Jerzego Wojtasiewicza, protokół skrócony rozprawy, k. 309-311, płyta CD, k. 312)*

W pismach z dnia 2 kwietnia 2008 r. Starostwo Powiatowe zawiadamiało o wszczęciu, na wniosek Antar LTD sp. z o.o., postępowań administracyjnych dotyczących zagospodarowania, uzbrojenia terenu i zabudowy działek nr 90 i 94/2 w Rozpłuciu Pierwszym, na terenie Ośrodka Wypoczynkowego „JAGODA". Pisma te przekazywane były również do wiadomości Jerzego Wojtasiewicza, co zostało uwidocznione w ich treści *(k. 172, 180, 187, 200, 207)*

W toku w/w postępowań Jerzy Wojtasiewicz wnosił o ich zawieszenie do czasu uprawomocnienia się decyzji Ministra Infrastruktury wydanej w sprawie BO1d/782-R-124/07 dotyczącej zwrotu wywłaszczonej nieruchomości – dawnej działki nr 285, obecnie części działki nr 90. Wnioski te nie były doręczane dzierżawcy.

Postanowieniami z dnia 30 kwietnia 2008 r. (sprawy: BAO.IV.7351/120/08-4, BAO.IV.7351/119/08-4, BAO.IV.7351/118/08-4, BAO.IV.7351/117/08-4, BAO.IV.7351/104/08-4, BAO.IV.7351/105/08-4, BAO.IV.7351/98/08-6, BAO.IV.7351/98/08-5), Starosta Powiatowy w Łęcznej odmówił zawieszenia postępowań, wskazując jednocześnie, że Jerzy Wojtasiewicz nie jest ich stroną. Postanowienia zostały doręczone również spółce Antar Ltd w dniach 2 i 5 maja 2008r. i odebrane przez Wiesława Tokarza.

*(wnioski o zawieszenie postępowań, k. 171, 178, 186, 193, 199, 206, 212, postanowienia z dnia 30 kwietnia 2008 r. , k. 168-169, 175-176 183-184, 191-192, 196-197, 203-204, 209-210, 213-214, potwierdzenia odbioru, k. 170v, 177v, 185v, 198v, 205v, 211, 215)*

Jerzy Wojtasiewicz, pismem złożonym dnia 1 kwietnia 2008 r. zgłosił do Prokuratury Rejonowej w Lublinie wniosek o wszczęcie postępowania karnego

w związku z inwestycją prowadzoną przez Antar LTD sp. z o.o. w Lublinie bez wymaganego pozwolenia na budowę na działce nr 90 położonej w miejscowości Rozpłucie-Garbów. W toku postępowania stwierdzono, że sanitariaty postawione bez wymaganego zezwolenia zostały rozebrane. Postanowieniem z dnia 28 kwietnia 2008 r. Komenda Powiatowa Policji w Łęcznej odmówiła wszczęcia dochodzenia wobec znikomej społecznej szkodliwości czynu. *(wniosek o wszczęcie postepowania karnego, k. 653, dokumenty, k. 654-682, 693-696 postanowienie z dnia 28 kwietnia 2008 r., k. 685)*

Jerzy Wojtasiewicz odwiedził również teren Ośrodka w latach 2007-2008 r., gdy trwały prace budowlane, informując pracowników, że prawo do części nieruchomości jest sporne. Nie rozmawiał jednak z prezesem ani właścicielem spółki Antar LTD.

Pracownicy Ośrodka informowali Wiesława Tokarza o tym, że ktoś rości sobie prawa do nieruchomości i że w związku z tym toczy się postępowanie. Wiesław Tokarz nie przekazywał tego typu informacji organom spółki uznając, że nie leży to w zakresie jego kompetencji.

*(zeznania Jerzego Wojtasiewicza, protokół skrócony rozprawy, k. 309-311, płyta CD, k. 312, zeznania Wiesława Tokarza, k. 252-254, płyta CD, k. 255)*

W dniu 13 czerwca 2008 r., w toku postępowania w sprawie o stwierdzenie nieważności decyzji Prezesa Urzędu Mieszkalnictwa i Rozwoju Miast z dnia 22 marca 2000 r. (PO.5.1-O-85-99), utrzymującej w mocy decyzję Wojewody Lubelskiego z dnia 14 grudnia 1998 r. (GKN.GW.7221-2/76/98) odmawiającą zwrotu nieruchomości położonej w m. Rozpłucie-Garbów, oznaczonej jako działka nr 285 o pow. 3,21 ha, stanowiącej część obecnej działki nr 90, przeprowadzono oględziny nieruchomości, w których brał udział, oznaczony w protokole, jako dzierżawca- Wiesław Tokarz, zaś oznaczony jako pełnomocnik dzierżawcy  radca prawny Marek Pawłowski. W czynnościach uczestniczył również Jerzy Wojtasiewicz *(protokół oględzin, k. 98-101).*

12

Spółka Antar LTD była wzywana do udostępnienia działki na termin oględzin przez Ministerstwo Infrastruktury. Na polecenie wójta Gminy Ludwin Zygmunta Ogórka - Krystyna Florek- inspektor ds. gospodarki nieruchomościami w Urzędzie pozwanej Gminy, skontaktowała się z Wiesławem Tokarzem z prośbą o udostępnienie nieruchomości celem przeprowadzenia oględzin.

Wiesław Tokarz dysponował pełnomocnictwami udzielonymi dnia 10 kwietnia 2008 r. i 12 czerwca 2008 r. przez prezesa spółki Antar LTD do jej reprezentowania przed organami administracji publicznej, we wszelkich sprawach związanych z postępowaniem dotyczącym inwestycji na terenie Antar Resort Piaseczno nad Jeziorem Piaseczno.

Marek Pawłowski dysponował pełnomocnictwem z dnia 12 czerwca 2008 r. do reprezentowania Antar LTD spółki z ograniczoną odpowiedzialnością z siedzibą w Lublinie do jej reprezentowania przed organami administracji publicznej, sądami powszechnymi i administracyjnymi oraz innymi podmiotami w sprawach związanych z postępowaniem dotyczącym inwestycji na terenie Antar Resort Piaseczno nad Jeziorem Piaseczno. Pełnomocnictwa udzielił przez zarządu Spółki.

Pełnomocnictwa posiadane przez Wiesława Tokarza i Marka Pawłowskiego były udzielane stosownie do potrzeb- tzn. w razie konieczności złożenia lub odbioru dokumentów w toku postępowań przed organami administracji, głównie organami budowlanymi.

Wiesława Tokarz nie jest pracownikiem powoda, świadczył usługi na jego rzecz (i jego poprzednika prawnego) w toku procesu inwestycyjnego, w szczególności w zakresie uzyskiwania pozwoleń na budowę.

Powyższe pełnomocnictwa nie upoważniały do reprezentowania Antar LTD sp. z o.o. w toku postępowań o zwrot nieruchomości. Spółka nie była stroną tego postępowania. W czasie oględzin Wiesław Tokarz złożył swoje

13

pełnomocnictwo przeprowadzającym je pracownikom Ministerstwa Infrastruktury i nie było ono kwestionowane.

Po zakończeniu oględzin, Wiesław Tokarz zgłosił się do zastępcy wójta Gminy Ludwin celem uzyskania informacji o wynikach oględzin, ten zaś poinformował go, że były one korzystne dla Gminy. Wiesław Tokarz przekazał tę informację Andrzejowi Pawlakowi, prezesowi zarządu spółki Antar LTD. Prezes zarządu spółki uznał, że nie istnieje problem związany z tym postępowaniem.

*(pełnomocnictwa, k. 221-223, 895,896, zeznania Andrzeja Pawlaka, Krystyny Florek, Wiesława Tokarza, Sławomira Czubackiego, wszyscy, k.252-254, płyta CD, k. 255, Elżbiety Skarbek, k. 781v-783, Darii Predko, k. 783-784, Jarosława Tarnasiewicza-Helduta, k. 1037v-1039, wezwania, k. 891, potwierdzenie odbioru, k. 893)*

Nieruchomość, na której posadowiono Ośrodek Wypoczynkowy „JAGODA" nad Jeziorem Piaseczno, był przez wiele lat przedmiotem umów dzierżawy, jednak bezpośrednio przed zawarciem umowy dzierżawy z powodem, ośrodek prowadzony był przez Gminę Ludwin, z uwagi na brak chętnych podmiotów zewnętrznych. W ogłoszeniach przetargowych zamieszczanych przez Gminę Ludwin zawarta była informacja o braku obciążeń nieruchomości.

W czasie kilkumiesięcznych rokowań dotyczących zawarcia umowy, przedstawiciele Gminy Ludwin nie informowali reprezentantów Antar LTD sp. z o.o. o toczącym się postępowaniu wywłaszczeniowym. Zarówno Wójt Gminy, jak i jego zastępca, w związku ze stanowiskiem spółki Antar LTD, przewidywali możliwość zbycia w przyszłości nieruchomości, po uprzednim poczynieniu inwestycji na infrastrukturę ośrodka wypoczynkowego.

Przedstawiciele Gminy obawiali się bowiem, że w razie niezwłocznej sprzedaży całej nieruchomości, spółka dokona jej podziału i zbycia na rzecz kolejnych podmiotów, podczas gdy Gmina chciała zachować dotychczasowy

charakter nieruchomości. Każda ze stron reprezentowana była przez podmioty świadczące pomoc prawną.

*(zeznania Andrzeja Pawlaka, Krystyny Florek, Wiesława Tokarza, Sławomira Czubackiego, Zygmunta Ogórka, k.252-254, płyta CD, k. 255, Jarosława Tarnasiewicza-Helduta, k. 1037v-1039)*

Sąd Okręgowy ustalił stan faktyczny w oparciu o wskazane dowody.

Zasadniczo dokumenty przedstawiane przez strony nie były kwestionowane, wyjąwszy protokół oględzin nieruchomości z dnia 13 czerwca 2008 r. *(k. 98-101,)* w zakresie w jakim określono Wiesława Tokarza jako dzierżawcę, zaś Marka Pawłowskiego jako przedstawiciela dzierżawcy. Niemniej jednak, pomimo zastrzeżeń pełnomocników powoda, co do braku wpływu oznaczonych osób na sposób ich określenia w protokole, wskazać należy, że Wiesław Tokarz jednoznacznie zeznał, że uważa podpisanie się jako dzierżawca za swój błąd, co jednoznacznie świadczy o tym, że wiedział jak został w protokole określony, zaś wszelkie twierdzenia o dopisaniu jego osoby *post factum* nie znajdują potwierdzenia w stanie faktycznym.

Wobec powyższego wszystkim przywołanym powyżej dokumentom Sąd dał wiarę.

Oceniając zeznania świadków Sąd w pierwszej kolejności miał na uwadze to, z którą ze stron procesu dany świadek związany był na etapie przygotowywania, realizowania umowy, a także obecnie, albowiem w dużej mierze treść zeznań powiązana była z tą okolicznością.

Wskazać jednak należy, że świadek Andrzej Pawlak, działając jako prezes spółki Antar LTD (podobnie jak Jarosław Tarnasiewicz-Heldut) posiadał dokładne informację dotyczące procesu negocjacyjnego i zawierania umowy dzierżawy, natomiast w zakresie samej realizacji inwestycji, w szczególności postępowań administracyjnych, jego wiedza w dużej mierze opierała się o informacje uzyskane od Wiesława Tokarza, który w ramach prowadzonej przez

15

siebie działalności gospodarczej zajmował się bezpośrednio kwestiami pozwoleń na budowę i wiążącymi się z nimi procesami administracyjnym, czynnościami na terenie samej nieruchomość, a także kontaktami z Gminą Ludwin (o charakterze mniej sformalizowanym).

Natomiast świadek Zygmunt Ogórek wielokrotnie, podczas zeznań zasłaniał się niepamięcią, co związane było z przebytym przez niego udarem. Z ramienia Gminy, z uwagi na zakres obowiązków i bezpośrednie uczestnictwo, a więc i wiedzę w tym przedmiocie, szczegółowe zeznania złożyła Krystyna Florek, natomiast proces rokowań pomiędzy Gminą a spółką Antar LTD znany był również Sławomirowi Czubackiemu, zastępcy wójta w czasie negocjacji, obecnie już tej funkcji niepełniącego.

Świadek Mirosław Woźniak, nie jest bezpośrednio zaangażowany w spór, jego zeznania były rzeczowe i nie budziły wątpliwości. Podobnie jak zeznania uczestniczących w oględzinach nieruchomości w czerwcu 2008 r. pracownic Ministerstwa Infrastruktury: Elżbiety Skarbek i Darii Predko.

Nie było również podstaw do odmowy wiarygodności zeznaniom Jerzego Wojtasiewicz, które znalazły także potwierdzenie w dokumentach znajdujących się w aktach sprawy, a które przedstawiały fakty, co oczywiste, z perspektywy sytuacji świadka.

Wobec powyższych okoliczności Sąd dał wiarę zeznaniom Andrzeja Pawlaka, Wiesława Tokarza, Jarosława Tarnasiewcza-Helduta, Sławomira Czubackiego, w zakresie w jakim podawali oni, że w toku rokowań Gmina przedstawiała reprezentującym spółkę osobom możliwość sprzedaży nieruchomości w przyszłości, zaś artykułowane w zeznaniach obawy władz Gminy dotyczące parcelacji i sprzedaży działek, niezależnie od ustaleń miejscowego planu zagospodarowania przestrzennego, pozostają w logicznym związku z treścią umowy i inwestycjami następnie podjętymi przez powoda i jego poprzednika. Wskazać nadto należy, że w przypadku podmiotów prowadzących działalność deweloperską na znaczną skalę, w oparciu o zasady doświadczenia

16

życiowego, trudno przyjąć by podmioty te podjęły istotne inwestycje, bez gwarancji udzielanych przez kontrahenta. Z tych też względów nie można było uznać za wiarygodne zeznań Krystyny Florek i Zygmunta Ogórka wskazujących na niezmienne deklaracje Gminy o tym, że umowa dotyczy dzierżawy, nie przewidując możliwości sprzedaży. Nadto należy podkreślić sprzeczność w zeznaniach Zygmunta Ogórka, który raz wskazywał, że niemożliwą była sprzedaż działki z uwagi na postępowanie rewindykacyjne, a następnie, że niemożność sprzedaży wynikała wyłącznie z warunków jej komunalizacji (a więc prowadzenie przez Gminę ośrodka wypoczynkowego). Drugi z argumentów pozostaje w oczywistej sprzeczności z możliwością jej sprzedaży przewidzianą w umowie.

Natomiast kwestie braku oficjalnych informacji o toczącym się postępowaniu rewindykacyjnym w odniesieniu do części nieruchomości w istocie były pomiędzy stronami bezsporne. Zygmunt Ogórek zeznał, że nie informował kontrahenta na żadnym etapie negocjacji o toczącym się postępowaniu w przedmiocie zwrotu nieruchomości, nie miał również wiedzy, czy którykolwiek z pracowników takich informacji udzielał, w każdym bądź razie należało uznać, że poleceń takich nie wydawał. Natomiast z zeznań Sławomira Czubackiego wynika, że Gmina bagatelizowała opisywane postępowanie, wskazując na oczywistą bezzasadność roszczeń J. Wojtasiewicza, co zasadniczo znajduje wyraz w treści zeznań Zygmunta Ogórka.

Zeznania świadka Wiesława Tokarza, w zakresie w jakim przedstawiał on swoją wiedzę o postępowaniu zwrotowym są niekonkretne, bowiem stwierdza on, że nie został poinformowany o toczącym się postępowaniu, następnie, że podejmował próby dowiedzenia się w Urzędzie Gminy, po czym, że oględziny nieruchomości wiązał z wnioskami o środki unijne, zaś w dalszej kolejności, że wiedział, iż oględziny związane były z roszczeniami „jakichś ludzi" dotyczących nieruchomości. Natomiast zeznania Krystyny Florek, w zakresie w jakim stwierdza ona, że jednoznacznie informowała Wiesława Tokarza o toczącym się postępowaniu zwrotowym i o tym, że wyłącza ono możliwość zbycia

nieruchomości, przy uwzględnieniu całości materiału dowodowego nie mogą znaleźć potwierdzenia.

Wiarygodne, bo korespondujące z treścią złożonych do akt sprawy dokumentów są zeznania świadka Zbigniewa Dąbka ( k 1149-1150). Świadek opisał proces wydawania pozwoleń na budowę, odmowy zawieszenia procesu inwestycyjnego, ale też przebieg spotkania u Starosty. Przyznał, że w spotkaniu brał udział Jarosław Tarnasiewicz –Heldut, ale stwierdził też, że informacja o toczącym się postępowaniu zwrotowym, w jego ocenie, nie miała wpływu na przebieg procesu inwestycyjnego. Zeznania tej treści w sposób jednoznaczny charakteryzują sposób podejścia organów samorządowych do toczącego się postępowania administracyjnego o zwrot części nieruchomości, o bagatelizowaniu jego wagi i znaczenia, o czym szerzej mowa będzie w dalszej części uzasadnienia. Podobnie wnioski wysnuć można z zeznań świadka Adama Niwińskiego – ówczesnego Starosty Łęczyńskiego ( k 1151—1151v), który na pytanie, „czy roszczenia Pana Wojtasiewicza były traktowane poważnie, czy błaho", odpowiedział, że celem spotkania w jego gabinecie faktycznie było zapewnienie sprawnego procesu wydawania decyzji – pozwoleń na budowę.

Częściowo tylko na obdarzenie wiarą zasługują natomiast zeznania złożone w charakterze strony przez Wójta Gminy Ludwin – Andrzeja Chabrosa ( k 1151v-1153). Przede wszystkim nie są przekonywujące te fragmenty jego zeznań, które opierają się na informacji uzyskanej od osób trzecich, bądź te, które sprowadzają się do prawnej interpretacji zapisów umownych. Świadek przyznał jednakże, że zlecał inspektorowi nadzoru dokonanie sprawdzenia przedstawianych przez powódkę kosztorysów pod względem rzeczowym i finansowym, co w konsekwencji doprowadziło do zatwierdzenia tych kosztorysów. Kwestionowane były jedynie niektóre pozycje tych kosztorysów. Zaznaczyć należy, że opinia biegłego z zakresu budownictwa opierała się na pracach, które nie były przez pozwaną kwestionowane, co uwiarygadnia opinię złożoną przez biegłego.

18

Zeznania złożone w charakterze strony powodowej przez Prezesa Zarządu Spółki Sylwię Tarnasiewicz- Heldut ( k 1151v) były nieistotne z punktu widzenia merytorycznego rozstrzygnięcia, bowiem nie miała ona żadnej wiedzy na temat prowadzonej inwestycji i realizacji postanowień zawartej umowy.

Z uwagi na konieczność posiadania wiadomości specjalnych w zakresie poszanowania wartości nakładów poczynionych przez stronę powodową na nieruchomość pozwanej, Sąd dopuścił dowód z opinii biegłego z zakresu budownictwa. Z uwagi na umotywowane zastrzeżenia strony pozwanej Sąd dopuścił następczo również dowód z opinii uzupełniającej.

Biegły wyczerpująco wyjaśnił przesłanki, które stały się podstawą sporządzonej opinii. Szczegółowo wykazał wartość poszczególnych prac i współczynniki, które stanowiły podstawę do ustalenia tej wielkości. W opiniach uzupełniających wyczerpująco odnosił się również do wątpliwości zgłaszane przez stronę pozwaną, uwzględniając także częściowo podnoszone zarzuty. Sąd miał jednakże na uwadze, że biegły błędnie zaliczył jako wartość nakładów czynsz dzierżawny, którego wysokość między stronami była bezsporna. Czynsz dzierżawny nie jest nakładem i nie może mieć wpływu na jego wysokość . Wobec przejrzystego przedstawienia przez biegłego metod, o które wyliczył wartości nakładów, bez wliczania w nie czynszu, Sąd w oparciu o posiadane dane, doprecyzował wartość nakładów brutto na kwotę 11.239.951,09 zł. (13.380.894,15 zł x 84 % -bo 16 % zużycia, k. 925)

Końcowo zgłoszone przez pozwanego zarzuty do opinii miały charakter polemiczny, czy też odnoszący się do oceny prawnej faktów, wobec czego ostatecznie bezprzedmiotowe stało się dopuszczanie dowodu z opinii innego biegłego. Powoływanie się przez pełnomocnika pozwanej Gminy na różnicę w wyliczeniach, nie stanowi podstawy do odmowy rzetelności opinii biegłego. Materia stanowiąca podstawę sporządzenia opinii była skomplikowana, a dostęp do materiałów źródłowych utrudniony. Nie można też pominąć faktu, że zakres robót, o które opierał się biegły, zatwierdzany był przez stronę pozwaną

corocznie, w toku rozliczeń czynszowych, a strona pozwana nie kwestionowała ustalonego przez biegłego zakresu robót, ani dokumentów składanych biegłemu *(protokół, k. 393)*.

Zgodnie z art. 278 § 1 k.p.c., w wypadkach wymagających wiadomości specjalnych, sąd po wysłuchaniu wniosków stron co do liczby biegłych i ich wyboru, może wezwać jednego lub kilku biegłych w celu zasięgnięcia ich opinii. Dowód ten, jak podkreśla się w orzecznictwie, podlega ocenie sądu przy zastosowaniu art. 233 § 1 k.p.c., na podstawie właściwych dla jej przedmiotu kryteriów zgodności z zasadami logiki i wiedzy powszechnej, poziomu wiedzy biegłego, podstaw teoretycznych opinii, a także sposobu motywowania oraz stopnia stanowczości wyrażonych w niej wniosków. Nie można przyjąć, iż sąd zobowiązany jest dopuścić dowód z kolejnych biegłych w każdym przypadku, gdy złożona opinia jest niekorzystna dla strony. Potrzeba powołania innego biegłego powinna zatem wynikać z okoliczności sprawy, a nie z samego niezadowolenia strony z dotychczasowej złożonej opinii (wyrok SA w Krakowie z dnia 31 stycznia 2013 r., I ACa 1339/12).

W oparciu o powyższe Sąd dokonał ustaleń faktów istotnych dla rozstrzygnięcia w sprawie.

### Sąd Okręgowy zważył, co następuje:

Powodowa spółka domaga się zwrotu nakładów poczynionych przez nią i jej poprzednika prawnego na podstawie umowy zawartej wskutek złożenia oświadczenia woli pod wpływem błędu, od którego skutków uchyliła się poprzez złożenie stosownego oświadczenia.

Błąd dotyczyć miał okoliczności określonych w § 2 i 12 umowy dzierżawy, a więc zapewnienia pozwanej o braku obciążeń, praw rzeczowych i zobowiązań osób trzecich oraz o tym, że nie wie o okolicznościach wyłączających wykorzystanie nieruchomości na teren ośrodka wypoczynkowego oraz

przyznania dzierżawcy prawa nabycia przedmiotu dzierżawy w drodze bezprzetargowej, na zasadach określonych w odrębnych przepisach w przypadku zabudowy na podstawie pozwolenia na budowę.

Powódka podawała, że były one niezgodne z rzeczywistością, bowiem w odniesieniu do części nieruchomości toczyło się postępowanie administracyjne w przedmiocie zwrotu nieruchomości na rzecz wywłaszczonych właścicieli, o czym poprzedniczka powódki nie wiedziała.

Artykuł 84 k.c. stanowi, że w razie błędu co do treści czynności prawnej można uchylić się od skutków prawnych swego oświadczenia woli. Jeżeli jednak oświadczenie woli było złożone innej osobie, uchylenie się od jego skutków prawnych dopuszczalne jest tylko wtedy, gdy błąd został wywołany przez tę osobę, chociażby bez jej winy, albo gdy wiedziała ona o błędzie lub mogła z łatwością błąd zauważyć; ograniczenie to nie dotyczy czynności prawnej nieodpłatnej (§ 1). Można powoływać się tylko na błąd uzasadniający przypuszczenie, że gdyby składający oświadczenie woli nie działał pod wpływem błędu i oceniał sprawę rozsądnie, nie złożyłby oświadczenia tej treści, a więc błąd istotny (§ 2).

Błąd na który powołuje się podmiot uchylający się od skutków wadliwie złożonego oświadczenia woli musi dotyczyć czynności prawnej i być istotny, chyba, że wywołany był podstępem (art. 86 § 1 k.c.).

Za podstępne wywołanie błędu uważa się świadome działanie kontrahenta mające na celu wywołanie mylnego wyobrażenia o rzeczywistości.

W ocenie Sądu okoliczność ta nie miała miejsca. Z zeznań Sławomira Czubackiego wynika, że w Gminie bagatelizowano postępowanie z udziałem Jerzego Wojtasiewicza, bowiem jego żądania nie były uznawane za zasadne i mające jakiekolwiek znaczenie. Podobny wniosek można wysnuć również z zeznań Zygmunta Ogórka, który wskazywał, że nie wie czy któryś z pracowników udzielał informacji o postępowaniu zwrotowym dotyczącym części działki nr 90, zaś on sam uczestników rokowań nie informował. Świadek Krystyna Florek

21

podawała natomiast, że nie uważa by tego typu roszczenie stanowiło obciążenie nieruchomości, wobec czego nie widziała potrzeby zamieszczania stosownych informacji w ogłoszeniach o przetargach, zaś zapewnienie udzielone w § 2 umowy uważa za prawidłowe. Działania Gminy w tym zakresie należy więc oceniać jako pozbawione należytej dbałości czy staranności, jednak Sąd nie znalazł podstaw do uznania, że nakierowane były one na celowe wprowadzenie przedstawicieli spółki Antar LTD w błąd.

Błąd co do treści czynności prawnej oznacza w istocie błąd co do okoliczności wchodzących w skład treści tejże czynności (tak np. uzasadnienie uchwały SN z dnia 18 listopada 1967 r., III CZP 59/67, OSNC 1968, nr 7, poz. 117). Ustalenie treści czynności prawnej i jej składników, musi być dokonane przy uwzględnieniu postanowienia art. 56 k.c. Dlatego nie można tracić z pola widzenia okoliczności, iż konkretna, stanowiąca przedmiot oceny czynność prawna wywołuje "nie tylko skutki w niej wyrażone, lecz również te, które wynikają z ustawy, zasad współżycia społecznego i ustalonych zwyczajów". Mylne wyobrażenie, które mieści się pod pojęciem błędu obejmuje zarówno treść oświadczenia (pomyłkę) oraz inne okoliczności, jak np. fakty, do których odnosi się oświadczenie, normy prawne, mające zastosowanie do dokonywanej czynności prawnej, albo skutki prawne dokonywanej czynności prawnej (uzasadnienie wyroku SN z dnia 19 października 2000 r., III CKN 963/98, OSNC 2002, nr 5, poz. 63).

Błąd poprzednika powoda dotyczył okoliczności faktycznych związanych bezpośrednio ze statusem prawnym nieruchomości będącej przedmiotem umowy dzierżawy, w której jednocześnie przyznano dzierżawcy uprawnienie do nabycia nieruchomości, po jej uprzednim zabudowaniu. Nie ulega więc wątpliwości, że w świetle powyższych rozważań błąd dotyczył treści czynności prawnej.

Drugą przesłanką jest istotny charakter błędu, a więc warunkujący dokonanie czynności prawnej.

22

W literaturze i orzecznictwie podnosi się, że błąd musi być istotny subiektywnie i obiektywnie. Subiektywna istotność błędu oceniana powinna być biorąc pod uwagę istotność postanowień, których błąd dotyczył (najczęściej istotny będzie błąd dotyczący cech przedmiotu świadczenia) dla osoby, która złożyła oświadczenie. Istotność błędu "musi być (…) także obiektywna, czyli tego rodzaju, że rozsądnie działający człowiek znający prawdziwy stan rzeczy, nie złożyłby oświadczenia woli tej treści" (uchwała SN z 31.8.1989 r., III PZP 37/89, OSN 1990, Nr 9, poz. 108). Obiektywna ocena istotności błędu polega na rozważeniu, czy w takich samych okolicznościach rozsądna osoba, złożyłaby oświadczenie woli, gdyby nie działała pod wpływem błędu.

Ocena czy błąd jest istotny winna przebiegać w oparciu o analizę treści całej umowy oraz pozostałych okoliczności jej zawarcia.

Jak wynikało z zeznań świadków- Wiesława Tokarza, Sławomira Czubackiego i Andrzeja Pawlaka, docelowo inwestor zmierzał do nabycia nieruchomości, jednak z uwagi na obawy władz Gminy Ludwin dotyczące możliwości podziału i zbycia podzielonej nieruchomości, a więc likwidacji ośrodka wypoczynkowego, została zwarta umowa dzierżawy, z której postanowień jasno wynika, że dzierżawca winien przystosować nieruchomość na potrzeby nowoczesnego ośrodka wypoczynkowego o wysokim standardzie (§ 1 pkt 4 umowy), jednocześnie ograniczając swoje uprawnienie do zwrotu równowartości poczynionych nakładów (§ 9 i 11 umowy). W ten sposób wydzierżawiająca nieruchomość Gmina, poprzez zabezpieczenie odpowiedniego i zgodnego z założeniami dotyczącymi prowadzenia ośrodka wypoczynkowego i, zabudowania dzierżawionych działek, uzyskała gwarancję zachowania dotychczasowego charakteru nieruchomości. Oczywistym jest więc, że istotnym warunkiem zawarcia umowy była przyszła sprzedaż nieruchomości, która jednak w warunkach toczącego się postępowania o jej zwrot, stosownie do treści art. 34 ust. 3 ustawy z dnia 21 sierpnia 1997 r. o gospodarce nieruchomościami (Dz. U.z 2015 r. poz. 782, ze zm.) nie była możliwa. Należy więc uznać, że spółka

posiadając informację o toczącym się postępowaniu, które wyklucza sprzedaż nieruchomości, nie zawarłaby umowy dzierżawy o podobnej treści.

Tym samym błąd był istotny i dotyczył treści czynności prawnej.

Zgodnie z art. 84 § 1 zdanie drugie, w przypadku czynności odpłatnych, spełniona być musi ponadto jedna z trzech wskazanych w nim przesłanek, mianowicie druga strona:

1) błąd wywołała swoim choćby niezawinionym zachowaniem albo
2) o błędzie wiedziała, lub wreszcie
3) z łatwością błąd mogła zauważyć.

Strona pozwana nie tylko nie ujawniała w toku rokowań, że w stosunku do nieruchomości toczy się postępowanie rewindykacyjne, ale również zapewniała o braku jakichkolwiek obciążeń nieruchomości, wobec czego niewątpliwym jest, że błąd został przez nią wywołany.

Artykuł 88 § 1 k.c. umożliwia uchylenie się od skutków prawnych oświadczenia woli, które zostało złożone innej osobie pod wpływem błędu lub groźby, poprzez oświadczenie złożone tej osobie na piśmie.

Takie oświadczenie zostało złożone w piśmie przedstawionym Gminie Ludwin dnia 18 listopada 2011 r. *(k. 66 i n.).*

Na gruncie sprawy niniejszej pojawia się zagadnienie związane z brakiem tożsamości podmiotu, który składał oświadczenie woli dotknięte wadą oraz podmiotem, który złożył oświadczenie o uchyleniu się od skutków błędu.

Powódka swoje uprawnienie wywodzi z umowy zawartej z uprzednim dzierżawcą.

Zmiana stron umowy wzajemnej jest, co do zasady, dopuszczalna. W praktyce powinna ona mieć postać nowej umowy zawartej z udziałem osoby trzeciej, w której nastąpi jednoczesne zwolnienie z praw i obowiązków umownych dotychczasowego kontrahenta. Przyjmuje się jednak także dopuszczalność zmiany stron umowy na skutek dwustronnych czynności z udziałem osób trzecich, mających cechy przelewu wierzytelności (art. 509 i n. k.c.) oraz translatywnego przejęcia długu (art. 519 i n. k.c.), przy czym

24

skuteczność prawna takich czynności uzależniona jest od zachowania wymaganej formy ( por. wyroki Sądu Najwyższego z dnia 6 listopada 1972 r., III CRN 266/72, OSN 1973, nr 9, poz. 160 oraz z dnia 17 czerwca 1999 r., I CKN 44/98, nie publ., tak Sąd Apelacyjny w Poznaniu w wyroku z dnia 21 kwietnia 2010 r., I ACa 214/10).

Mocą zawartej na piśmie umowy przeniesienia praw i obowiązków z umowy dzierżawy z dnia 23 września 2009 r. (k. 24 i n.), nie kwestionowanej przez stronę pozwaną, Antar LTD spółka z ograniczoną odpowiedzialnością z siedzibą w Lublinie przeniosła na powódkę prawa i obowiązki z umowy dzierżawy Ośrodka Wypoczynkowego JAGODA nad Jeziorem Piaseczno. Pozwana Gmina udzieliła na w/w umowę zgody, pod warunkiem przeniesienia siedziby spółki Solo Investment na teren Gminy Ludwin, co jak wynika z odpisu z rejestru przedsiębiorców KRS załączonego do pozwu *(k. 14-15)*, nastąpiło.

Zgodnie z art. 509 § 2 k.c. wierzyciel może bez zgody dłużnika przenieść wierzytelność na osobę trzecią (przelew), chyba że sprzeciwiałoby się to ustawie, zastrzeżeniu umownemu albo właściwości zobowiązania. Wraz z wierzytelnością przechodzą na nabywcę wszelkie związane z nią prawa, w szczególności roszczenie o zaległe odsetki (§ 2). W świetle art. 511 k.c. jeżeli wierzytelność jest stwierdzona pismem, przelew tej wierzytelności powinien być również stwierdzony pismem. Art. 519 k.c. stanowi natomiast, że osoba trzecia może wstąpić na miejsce dłużnika, który zostaje z długu zwolniony (§ 1). Przejęcie długu może nastąpić przez umowę między dłużnikiem a osobą trzecią za zgodą wierzyciela. Oświadczenie wierzyciela może być złożone którejkolwiek ze stron. Jest ono bezskuteczne, jeżeli wierzyciel nie wiedział, że osoba przejmująca dług jest niewypłacalna (§ 2 pkt 2). Umowa o przejęcie długu powinna być pod nieważnością zawarta na piśmie. To samo dotyczy zgody wierzyciela na przejęcie długu (art. 522. k.c.).

Wobec zachowania wymaganej formy i uzyskania zgody Gminy Ludwin, zmiana stron umowy była prawnie skuteczna.

25

Uprawnienie do złożenia oświadczenia o uchyleniu się od skutków oświadczenia woli złożonego pod wpływem błędu ma charakter uprawnienia prawnokształtującego, bowiem tworzy po stronie podmiotu uprawnionego kompetencję do jednostronnej zmiany lub zakończenia istniejącego stosunku prawnego (por. Z. Radwański, Prawo cywilne- część ogólna., C.H. Beck 2009r., s. 90). Podnieść jednak należy, iż przedmiotem przelewu nie jest jedynie możność żądania od dłużnika, by ten spełnił świadczenie. Przelew bowiem powoduje nie tylko sukcesję samej wierzytelności, lecz również obejmuje inne elementy składające się na sytuację wierzyciela. W jego wyniku cesjonariusz uzyska i prawa kształtujące, a wśród nich możliwość złożenia oświadczenia w trybie art. 88 § 1 k.c. (por. np. wyroki SN z dnia 28 listopada 2006 r., IV CSK 224/06, z dnia 22 kwietnia 2010,V CSK 376/09).

Wobec powyższego powódce, co do zasady, przysługiwało uprawnienie do uchylenia się o skutków oświadczenia o zawarciu umowy dzierżawy.

Niemniej jednak pozwana podniosła, że z uwagi na upływ czasu od momentu, w którym powódka (jej poprzedniczka prawna) błąd wykryła uprawnienie to wygasło.

Stosownie bowiem do art. 88 § 2 k.c. uprawnienie do uchylenia się wygasa w razie błędu – z upływem roku od jego wykrycia.

Termin do uchylenia się od skutków prawnych oświadczenia woli złożonego pod wpływem błędu rozpoczyna bieg od chwili jego wykrycia albo powstania stanu, w którym racjonalna osoba zdałaby sobie sprawę, że działała pod wpływem błędu. Według literalnego brzmienia przepisu, jedynie powzięcie wiedzy, a nie możliwość powzięcia wiedzy o błędzie jest zdarzeniem prawnym skutkującym początkiem biegu terminu zawitego. Wąska, literalna wykładnia przepisu oznaczałaby, że osoba, która ze względu na swoją niestaranność nie zauważyła błędu, mimo że rozsądna osoba na jej miejscu powinna była go zauważyć, dzięki swej niestaranności dysponowałaby dłuższym okresem na uchylenie się od skutków oświadczenia woli (*Konrad Osajda, Kodeks cywilny. Komentarz,* C.H.Beck 2014 r., Biruta Lewaszkiewicz-Petrykowska, Komentarz

do Kodeksu cywilnego, LEX 2009, wyrok SA w Krakowie z dnia 22 lipca 2014 r., I ACa 638/14, LEX nr 1566999). Wskazać należy, że opisana wykładnia przepisu art. 88 § 2 k.c. pozostaje w zgodzie z art. 355 § 2 k.c., który, choć bezpośrednio odnosi się do wykonywania zobowiązań przez dłużnika, to znajduje także zastosowanie we wszystkich stosunkach prawnych z udziałem podmiotów „profesjonalnych". Zasada wynikające z tego przepisu zobowiązuje podmioty te do działania z należytą starannością w zakresie prowadzonej działalności gospodarczej uwzględniającą zawodowy charakter tej działalności.

Nie ulega wątpliwości, że Gmina nie udzieliła, w oficjalnej formie informacji o postępowaniu mającym na celu zwrot nieruchomości poprzednim właścicielom. Niemniej jednak do powódki, już w 2008 r., docierały informacje, że część wydzierżawionej nieruchomości objęta jest takim postępowaniem. Spółka bowiem, jak wynika z załączonych fotokopii dokumentów znajdujących się w aktach postępowania prowadzonego przez Ministra Infrastruktury (BO1d/782-R-124/07), była powiadamiana o konieczności udostępnienia działki nr 90 w celu przeprowadzenia oględzin dnia 13 czerwca 2008 r., zaś w treści zawiadomienia *(k. 891)* wskazano, że toczy się postępowanie w sprawie twierdzenia nieważności decyzji Prezesa Urzędu Mieszkalnictwa i Rozwoju Miast z dnia 22 marca 2000 r., znak PO.5.1-O-85/99, utrzymującej w mocy decyzję Wojewody Lubelskiego z dnia 14 grudnia 1998 r. (znak GKN.GW.7221-2/76/98), odmawiającą zwrotu nieruchomości położonej w miejscowości Rozpłucie-Garbów, oznaczonej jako działka nr 285, o pow. 3,21 ha. Dalej wskazano, że jest to obecnie część działki nr 90, o pow. 9,14 ha, zaś organ prowadzący postępowanie został zobowiązany do ustalenia kwestii realizacji celu wywłaszczenia dawnej działki nr 285. Wezwanie o tej treści zostało odebrane w siedzibie spółki Antar LTD przez jej pracownika w dniu 27 maja 2008 r. (k. 893). Do treści tych dokumentów pełnomocnik powoda nie odniósł się, nie kwestionował ich, zaś analiza całego materiału zebranego w sprawie wskazuje, że pismo odebrane zostało przez tą samą osobę, która odbierała korespondencję przesyłaną ze Starostwa Łęczyńskiego w innych terminach, wobec czego nie ma

27

przesłanek by uznać, że była to osoba nieuprawniona, czy przypadkowa. Wskazać należy też, że korespondencja pochodziła od organu bezpośrednio prowadzącego postępowanie w sprawie, wobec czego trudno przyjąć by nie zawierała ona pewnych czy wiarygodnych informacji. Co więcej, nawet gdyby nie byłyby one wystarczające dla spółki, to winny dać asumpt do działań zmierzających do wyjaśnienia tego zagadnienia. Nieakceptowalne jest bowiem stanowisko, zgodnie z którym profesjonalista ignoruje istotne z punktu jego działalności gospodarczej okoliczności, by po jakimś czasie powoływać się na swoją niewiedzę w tym zakresie.

Już powyższe wskazuje, na adres spółki Antar LTD doręczano korespondencję, która zawierała informacje pozwalające na wykrycie błędu. Także postanowienia wydawane w toku postępowań prowadzonych przez Starostę Łęczyńskiego, w swojej treści zawierały informację o postępowaniu w sprawie zwrotu wywłaszczonej nieruchomości oznaczonej jako dawna działka o nr 285, obecnie zaś część działki nr 90.

Osobną kwestią, silnie akcentowaną przez pozwaną był udział w oględzinach nieruchomości w czerwcu 2008 r. Wiesława Tokarza oraz Marka Pawłowskiego, którzy przedstawili prowadzącym je organom pełnomocnictwa pochodzące od zarządu spółki Antar LTD. Zarówno Wiesław Tokarz, jak i Andrzej Pawlak zeznawali, że pełnomocnictwo, które zostało złożone w toku oględzin miało charakter pełnomocnictwa jednorazowego, wydawanego stosownie do konkretnych potrzeb. Skoro więc spółka Antar LTD poinformowana została o oględzinach, zaś Wiesław Tokarz dysponował pełnomocnictwem wydanym dnia poprzedzającego czynność, które przedstawił przedstawicielom Ministerstwa Infrastruktury prowadzącym oględziny, to oznacza, w świetle zasad logiki, że zostało ono mu udzielone w związku z tą konkretną czynnością, na okoliczność której ją przedłożył. Tym samym należy uznać, że występował on w imieniu dzierżawcy w czasie tej czynności. Dowodem prawdziwości tego założenia może być również fakt, że zasięgał informacji u pracowników Urzędu

28

Gminy w zakresie wyników oględzin i informacje takie, wprawdzie o dość ogólnym charakterze, uzyskał i przekazał je prezesowi spółki Antar.

Szereg przestawionych okoliczności   prowadzi do wniosku, że poprzedniczka prawna powódki błąd mogła wykryć już w 2008 r., co prowadziło by do wniosku, że czynność została konwalidowana, z uwagi na bezskuteczny upływ czasu do uchylenia się od skutków oświadczenia woli złożonego pod wpływem błędu.

Niemniej jednak wskazać należy, że poprzedniczka prawna powódki działała w oparciu o zapewnienia swojego kontrahenta, jednostki samorządu terytorialnego, które negowały istnienie jakichkolwiek wątpliwości co do stanu prawnego, a w konsekwencji możliwości sprzedaży nieruchomości położonej nad Jeziorem Piaseczno. Dlatego też postępowanie dzierżawcy nie może być oceniane w oderwaniu od tych okoliczności. Skoro bezspornym jest, że w treści ogłoszeń o przetargu na wydzierżawienie nieruchomości nie informowano o postępowaniu w sprawie zwrotu nieruchomości, nie przedstawiano takiej informacji również w toku rokowań, a także już po zawarciu umowy, to powódka miała podstawy by pozostawać w przekonaniu, że takie okoliczności nie występują, a w konsekwencji nie traktować wiadomości zawartych w korespondencji kierowanej do spółki z Ministerstwa Infrastruktury, czy Starostwa Łęczyńskiego, jako dotyczących faktów wpływających na realizację postanowień umownych. Zarówno w doktrynie jak i orzecznictwie przyjmuje się bowiem, że błąd może dotyczyć zarówno okoliczności faktycznych jak i prawnych (tak SN w wyroku z dnia 6 czerwca 2003 r., IV CK 274/02, Lex nr 146440 i z dnia 5 grudnia 2000 r., IV CKN 179/00, Lex nr 52505), zaś w zakresie tych drugich, powodowa spółka wciąż pozostawała w mylnym przekonaniu, zaś błąd w tym zakresie został wykryty dopiero z chwilą przedstawienia przez wójta Gminy Ludwin formalnej informacji, że w istocie toczy się postępowanie w sprawie zwrotu części dzierżawionej nieruchomości *(k. 58)*, co pozwalało uznać tę okoliczność za prawie relewantną.

Przyjmując bowiem dotychczasowe i utrwalone poglądy na temat istoty błędu jako różnicy między stanem wyobrażanym przez składającego oświadczenie woli a stanem rzeczywistym, opartym w dziedzinie błędu co do prawa na wykładni i praktyce stosowania prawa, przez wykrycie błędu należy rozumieć zniesienie tej różnicy. Dla osiągnięcia tego stanu konieczne jest rozpoznanie stanu rzeczywistego i zmianę dotychczasowego wyobrażenia. Powzięcie informacji o istnieniu rozbieżności rozpoczyna dopiero proces poznawczy zmierzający do ustalenia, czego dotyczą różnice i jaki jest stan rzeczywisty. Ponieważ wykrycie błędu jest chwilą miarodajną dla podjęcia decyzji odnośnie do uchylenia się od jego skutków, przy błędzie co do prawa konieczne jest ich poznanie w takim przynajmniej zakresie, aby składający oświadczenie był w stanie ocenić istotność błędu (por. wyrok SN z dnia 6 czerwca 2003 r., IV CK 274/02, LEX nr 146440)

Pismo zawierające stosowną informację datowane jest dniem 22 września 2011 r., zaś złożenie oświadczenia o uchyleniu się od skutków oświadczenia woli złożonego pod wpływem błędu nastąpiło wdniu 18 listopada 2011 r., gdy powódka przedstawiła Gminie Ludwin stosowne pismo *(k. 66 i n.)*, wobec czego wymagany termin został zachowany. W konsekwencji skutecznego uchylenia się od skutków prawnych oświadczenia woli o zawarciu umowy dzierżawy, która przewidywała czynienie nakładów na nieruchomość, powódka domaga się zwrotu ich równowartości.

Skuteczne uchylenie się od skutków prawnych oświadczenia woli złożonego pod wpływem błędu czyni umowę nieważną *ex tunc*. Świadczenie spełnione w wykonaniu takiej umowy jest świadczeniem nienależnym (art. 410 § 2). Podstawą żądania jego zwrotu są przepisy o bezpodstawnym wzbogaceniu w związku z art. 410 § 1 k.c. (wyrok SN z dnia 9 lutego 1998 r., III CKN 372/97, LexPolonica nr 343981).

Artykuł 410 § 1 i 2 w zw. z art. 405 k.c. obliguje do zwrotu w naturze, a jeśli nie jest to możliwe do zwrotu wartości świadczenia uzyskanego nienależnie. Świadczenie jest nienależne, jeżeli ten, kto je spełnił, nie był w ogóle

zobowiązany lub nie był zobowiązany względem osoby, której świadczył, albo jeżeli podstawa świadczenia odpadła lub zamierzony cel świadczenia nie został osiągnięty, albo jeżeli czynność prawna zobowiązująca do świadczenia była nieważna i nie stała się ważna po spełnieniu świadczenia.

Fakt czynienia przez powódkę i jej poprzedniczkę nakładów nie był sporny. Zasadniczo w toku procesu pozwana nie kwestionowała zakresu robót a jedynie ich wartość, z uwagi na fakt, że nie została ona ustalona w oparciu o kosztorysy powykonawcze sporządzone na podstawie protokołów odbioru robót wykonanych.

W toku procesu powódka przedstawiła jednakże dokumenty potwierdzające zatwierdzenie przez Gminę Ludwin kosztu i zakresu wykonanych robót, zaś kosztorysy powykonawcze, będące podstawą opracowania tych dokumentów (a w toku postępowania będące podstawą dla biegłego do wydania opinii) były przedkładane Gminie Ludwin, celem ich weryfikacji przez powołanego w tym celu przez pozwaną specjalistę, co zostało wykazane w toku zeznań m.in. przez Krystynę Florek i Mirosława Woźniaka.

Skoro więc pomiędzy stronami niniejszego postępowania przyjmowano taki sposób weryfikacji wykonanych robót, a Gmina uważała go za prawidłowy i nie kwestionowała na etapie zgodnej współpracy ilości robót wykonanych, zaś na etapie postępowania sądowego nie wskazywała na wystąpienie jakichkolwiek okoliczności sugerujących nieprawidłowość uprzednio ustalonego i przyjętego przez nią zakresu nakładów, to ocena zasadności przedstawianych przez pozwaną zarzutów i jednocześnie ocena dokumentów przedłożonych przez powódkę, jako dowodów poczynionych nakładów, prowadzić winna do wniosku, że zarzuty pozwanej zgłaszane są nie z uwagi na zastrzeżenia o charakterze faktycznym, lecz jedynie z uwagi na obraną przez pozwaną Gminę strategię procesową.

Wobec ustalonego zakresu robót należało więc określić ich wartość. Jak wskazuje się w orzecznictwie (por. np. wyroki SN z dnia 12 marca 1998 r. I CSK 522/97, OSNC 1998/11/176 oraz z dnia 3 października 2003 r., III CKN 1313/00,

31

nie publ., z dnia 1 grudnia 2010 r., I CSK 64/10), jeżeli zwrot bezpodstawnego wzbogacenia ma nastąpić w pieniądzu, to w razie uwzględnienia powództwa zasądzeniu podlega zwrot aktualnego wzbogacenia, przez co należy rozumieć, zgodnie z art. 405 k.c. w zw. z art. 316 k.p.c. i stosowanym w drodze analogii art. 363 § 2 k.c., zwrot wzbogacenia istniejącego w chwili wyrokowania. Stanowisko to podziela Sąd rozpoznający sprawę.

Niezbędnym było ustalenie wartości nakładów, z uwzględnieniem stopnia ich zużycia, tak by możliwą do wskazania była aktualna wartość wzbogacenia pozwanej, co wymagało wiadomości specjalnych.

Biegły z zakresu budownictwa w swojej opinii, uwzględniając jedynie nakłady zatwierdzone przez pozwaną, podał wartości netto i brutto poczynionych nakładów *(k. 925)*.

Pozwana Gmina kwestionowała możliwość zasądzenia na rzecz powódki kwoty uwzględniającej podatek VAT, podnosząc, że część prac wykonywana była przez pracowników powoda, czyli metodą gospodarczą.

Odnosząc się do tego zarzutu wskazać należy, że nakłady na nieruchomość, które mają być przedmiotem zwrotu, na gruncie przepisów art. 8 ust. 1 ustawy z dnia 11 marca 2004 r. o podatku od towarów i usług (t.j. Dz. U. z 2011 r. Nr 177, poz. 1054 ze zm.) traktowane są przez organy podatkowe jako odpłatne usługi, a te zgodnie z art. 5 ust. 1 w/w ustawy podlegają opodatkowaniu podatkiem od towarów i usług, także w przypadku, gdy zobowiązanie do zwrotu ich wartości wynika z przepisów o bezpodstawnym wzbogaceniu, jeżeli dotyczy czynnego podatnika podatku VAT (por. wyrok NSA z dnia 10 maja 2011 r., I FSK/743/11). Takie rozumienie pojęcia związane jest z treścią przepisu art. 47 § 1 k.c. i 48 k.c., których skutkiem jest związanie z własnością gruntu jego części składowych, a więc rzeczy z nim trwale związanych, do których niewątpliwie należą budynki i budowle posadowione przez powódkę. Podobne stanowisko, na gruncie niniejszej sprawy zajął Minister Finansów w indywidualnej interpretacji podatkowej z dnia 28 sierpnia 2014 r., wydanej za pośrednictwem Dyrektora Izby Skarbowej w

32

Łodzi (znak IPTPP2/443-418/14-3/JN), którą powód załączył do akt sprawy *(k. 974-976)*. Bez znaczenia pozostaje fakt, że błędnie operował on pojęciem odstąpienia od umowy. Z tych też względów bez znaczenia pozostaje, czy powód wykonywał pracę poprzez swoich pracowników, czy też metodą zlecania robót innym podmiotom, bowiem całe świadczenie nakładów stanowi usługę. Wynikiem powyższego jest stwierdzenie, że zasądzone w rozpoznawanej sprawie świadczenie wiązać się będzie z obowiązkiem odprowadzenia podatku VAT przez powodową spółkę. Zgodnie zaś z przepisami art. 3 ust. 1 pkt 1 w zw. z ust. 2 ustawy o informowaniu o cenach towarów i usług z dnia 9 maja 2014 r. (Dz. U. z 2014 r., poz. 915), kupujący zobowiązany jest do zapłaty na rzecz przedsiębiorcy za usługę cenę, która obejmuje podatek od towarów i usług. Powyższe wymaga więc uwzględniania podatku VAT w zasądzonej na rzecz powoda kwocie, a więc ustalonej przez biegłego ceny brutto.

Rozstrzygnięcie w przedmiocie odsetek Sąd oparł o treść art. 481 w zw. z 455 k.c. Powód uchylił się od skutków oświadczenia woli o zawarciu umowy dzierżawy pismem złożonym pozwanej Gminie dnia 18 listopada 2011 r., jednocześnie wyznaczając jej 14 dniowy termin na zwrot, oznaczając tym samym termin spełnienia świadczenia. Tym samym, zgodnie z wezwaniem, odsetki należą się od dnia 3 grudnia 2011 r.

Natomiast fakt, że wysokość wzbogacenia ustala się wg stanu na dzień wyrokowania, nie implikuje zasądzenia od tego dnia odsetek. Postępowanie sądowe jest konsekwencją negowania przez pozwaną Gminę obowiązku spełnienia świadczenia, co jednak nie jest równoznaczne z brakiem jego wymagalności, zaś ustalenie wartości zwrotu nienależnego świadczenia wg stanu na dzień wyrokowania jest wyrazem urealnienia wysokości wzbogacenia w momencie jego zwrotu. Przepisy o nienależnym świadczenia odnoszą się bowiem do rzeczywistej korzyści uzyskanej przez wzbogaconego w chwili zwrotu jej równowartości, o czym świadczy treść np. treść przepisu art. 409 k.c. Pozwany zobligowany był do zwrotu świadczenia na rzecz powoda stosownie do regulacji wskazanych w przepisach prawa, z chwilą oznaczoną w wezwaniu do zapłaty. Nie

33

ma więc podstaw do ograniczenia obowiązku odsetkowego ciążącego na pozwanym.

Rozstrzygnięcie o kosztach procesu Sąd oparł o treść art. 102 k.p.c., zgodnie, z którym obciążył pozwaną Gminę obowiązkiem zwrotu części poniesionych przez powódkę kosztów, tj. opłaty od pozwu w wysokości 10.000,00 zł oraz zaliczek uiszczonych na koszt opinii biegłych w łącznej wysokości 11.562,12 zł. W ocenie Sądu, tylko taki podział kosztów procesu, z pominięciem poniesionych przez strony kosztów zastępstwa procesowego, gwarantuje realizację zasady słuszności, o której mowa w powołanym wyżej art. 102 k.p.c. Należy mieć też na względzie fakt, że obciążenie Gminy obowiązkiem zapłaty znacznej kwoty pieniężnej tytułem zwrotu nakładów, a jednocześnie obowiązkiem zwrotu poniesionych przez przeciwnika kosztów, może doprowadzić do powstania trudnej dla Gminy sytuacji finansowej i spowodować niemożność zrealizowania przyjętych planów rozwoju gminy i jej mieszkańców.

Pozostałe, nieuiszczone koszty w postaci części opłaty od pozwu, zostały przejęte stosownie do art., 113 ust. 3 ustawy o kosztach sądowych w sprawach cywilnych na rachunek Skarbu Państwa.

Z przyczyn wyżej podanych oraz z uwagi na treść cytowanych przepisów prawa Sąd orzekł jak w sentencji wyroku.





34